**FLORIDA GAS TRANSMISSION COM-PANY, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent (two cases).**

**FLORIDA PUBLIC UTILITIES COMMIS-SION, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

**Nos. 21957, 22089, 21964.**

United States Court of Appeals
Fifth Circuit.

June 13, 1966.

---

Robert Y. Patterson, Jr., Winter Park, Fla., Leon M. Payne, Houston, Tex., Robert M. Scott, Washington, D. C., Andrews, Kurth, Campbell & Jones, Houston, Tex., for Florida Gas Transmission Co., Abe Fortas, James R. McAlee, Arnold, Fortas & Porter, Washington, D. C., of counsel.

Richard A. Solomon, Gen. Counsel, F.P.C., Howard E. Wahrenbrock, Sol., F.P.C., Josephine Klein, Atty., F.P.C., Abraham Spalter, Asst. Gen. Counsel,

Cyril Wofsy, Atty., P.F.C., Washington, D. C., for respondent.

Lewis W. Pettaway, Tallahassee, Fla., for petitioner Florida Public Utilities Commission.

Before JONES, WISDOM and GEWIN, Circuit Judges.

GEWIN, Circuit Judge:

These three cases involve petitions for review of certain orders and opinions of the Federal Power Commission. They were filed pursuant to Section 19(b) of the Natural Gas Act, 15 U.S.C.A. § 717r (b).[1] Upon joint motion of all parties, the cases were ordered consolidated for all purposes of this review. There are two principal issues which, for simplicity, will be referred to as (1) the "cost" issue; and (2) the "tax" issue.

The facts surrounding the "cost" issue may be summarized as follows: Petitioner, Florida Gas Transmission Company (FGT), which owns and operates natural gas pipeline facilities extending from Texas to and throughout Florida, is successor in interest to the Houston Texas Gas and Oil Company (Houtex), which was organized during the 1950's to build and operate a natural gas pipeline. In order to finance the project, Houtex sold an aggregate of approximately 37.5% of its stock to four engineering and construction firms.[2] It then entered into an agreement with the firms whereby they would perform specified services necessary to construct the pipeline and be compensated "at the going rate" for such work. Houtex thereafter applied to the Federal Power Commission for a Certificate of Public Convenience and Necessity. The Commission reviewed all the facts relating to the project and stated the following:

> "Finally, it appears that the labor necessary for construction of the facilities of Houston Gas will be furnished by three construction companies, the president of each of which is an official and director of Houston Gas and that two of these construction companies own blocks of Houston Gas stock. Furthermore, a member of the firm of engineers which will supervise the construction and operation of the pipeline is also a vice president and director of Houston Gas. While as we have already stated, the cost of the proposed facilities appears to be reasonable, in view of this fact, this cost will be carefully scrutinized in any future proceeding dealing with accounting or rates of Houston Gas * * *."

Opinion 301, 16 FPC 118, 142 (1956).[3]

At a subsequent rate determination hearing, the Commission refused to consider as part of Houtex' "cost-of-service" the profits it paid to the four firms for their services because of the so-called "no-profits-to-affiliates" rule. Opinion 431, 31 FPC 1402, 1403 (1964).

The facts surrounding the "tax" issue may be summarized as follows: FGT

1. No. 21957—Petition of Florida Gas Transmission for review of Opinions 431, 31 FPC 1402 (1964) [original determination of both the "cost" and "tax" issues] and 431–A, 32 FPC 518 (1964) [denial of Motion for Re-hearing]; No. 22089—Petition of Florida Gas Transmission for review of Opinion No. 431–B, 32 FPC 908 (1964) [denial of Motion to Re-Open the record for the introduction of further evidence]; No. 21964—Petition of Florida Public Utilities Commission as intervenor supporting Florida Gas [asking for review of the same orders and opinions as above].

2. This was the maximum percentage the firms owned at any time. The figures were later substantially less. In its brief the Commission asserts that only three firms were involved because two of the four firms were acting jointly. However, in its opinion the Commission refers to amounts "paid to four engineering and construction firms * * *"

3. This Opinion was reviewed and affirmed in Florida Economic Advisory Council v. F. P. C., 102 U.S.App.D.C. 152, 251 F.2d 643 (1957), cert. den. 356 U.S. 959, 78 S.Ct. 996, 2 L.Ed.2d 1066 (1958). The issues now before this Court, however, were not dealt with specifically.

is also successor in interest to the Coastal Transmission Corporation (Coastal) which between 1958 and 1961 filed consolidated income tax returns with its parent corporation and fellow subsidiaries pursuant to the provisions of the Internal Revenue Code of 1954.[4] Although Coastal itself realized taxable income during this period, it incurred no actual tax liability because substantial losses from the other members of the corporate family were included in the return. During the same aforementioned rate proceeding, the Commission also refused to consider those taxes Coastal *would have paid,* had it filed a separate return, as part of its "cost-of-service." 31 FPC 1402, 1410 (1964).

Subsequent to the rate hearing, the Commission denied FGT's Motion for Rehearing, Opinion 431–A, 32 FPC 518 (1964), and Motion to Re-open the Record for introduction of further evidence, Opinion 431–B, 32 FPC 908 (1964). Florida Public Utilities Commission intervened and aligned itself with FGT.

■■ At the outset, we can readily dispose of the "tax" issue with our recent decision in United Gas Pipe Line Company v. FPC, 357 F.2d 230 (5 Cir. 1966), in which we adopted the rule of the Tenth Circuit, as set forth in Cities Service Gas Co. v. FPC, 337 F.2d 97 (10 Cir. 1964), that the federal taxes which a gas transmission company would have paid, but for a consolidated return, are properly to be included in the "cost-of-service" during rate determinations. Therefore, the order of the Commission denying Coastal's practice of accruing federal income taxes must be vacated.

As to the "cost" issue, the following extracts from the Commission's opinion in this case reveal the crux of its position:

"We think that our rule against profits to affiliates precludes allowing their [the firms] profits in the plant accounts of Houston Texas. The no-profits-to-affiliates rule goes far back in Commission history. See for example Alabama Power Co., 1 FPC 25, 39, aff'd. Alabama Power Co. v. McNinch [68 App.D.C. 132], 94 F.2d 601 (CADC 1937); Louisville Hydro-Electric Company, 1 FPC 130, 133, aff'd. Louisville Gas & Electric Co. v. F.P.C., 129 F.2d 126 (CA6 1942), cert. den. 318 U.S. 761 [63 S.Ct. 559, 87 L.Ed. 1133]. The basis of this rule is that a profit made by an enterprise dealing with itself does not represent cost."

\* \* \* \* \* \*

"To prevent the evils which have been the subject of past proceedings the rule against profits to affiliates must be sufficiently broad to cover fact as well as form."

\* \* \* \* \* \*

"The purpose of the rule is to prevent insiders taking advantage of their position and creating costs which are not subject to the check of ordinary business relationships. CF., Section 10 of the Clayton Act, 15 U.S.C. § 20. We do not think that some particular percentage of stock or of common officers or directors can be allowed to be determinative of whether the rule should apply, although these factors are relevant to determine when a relationship exists that calls for application of the exclusionary rule. That the contractors or promoters could not have dictated policies or ordered the execution of contracts if all other interests had chosen to oppose them cannot validate a relationship which by its very nature and history precludes unhampered bargaining, especially if the contractors or promoters were, as here, clearly dominant when the original contracts were agreed upon. If control exists, sufficient to dominate the execution of the contracts in the face

---

4. The petitioner, FGT, resulted from a merger of Coastal Transmission Corporation into Houston Texas Oil and Gas Corporation in 1962. Prior thereto both companies were wholly owned subsidiaries of

The Houston Corporation (now Florida Gas Company), and each operated separate segments of the Texas to Florida pipeline system.

of united opposition, that makes the rule automatically applicable; but our inquiry is not at an end if we conclude that the insider's influence resulting in the contract is or became somewhat less than this degree of control." 31 FPC 1402 at 1407.

Petitioners contend that (1) the Commission is estopped from deleting "reasonable profits" from Houtex' cost-of-service because of its pronouncements during the previous certification proceedings to the effect that the projected costs (including profits to the firms) of the project appeared to be "reasonable"; and (2) the "no-profits-to-affiliates" rule is inapplicable where, as here, neither party "controlled" the other. They seek to have the Commission's orders vacated and the case remanded with instructions to investigate the "reasonableness" of the profits without application of any "automatic" exclusion.

The majority opinion of the Commission framed the issue as to cost in the following language:

"On the first question there is an issue as to whether there was an *affiliation* between Houston Texas and the engineering and construction firms, and, if so, whether that part of the pipeline costs representing profits to these firms should be eliminated from the company's plant accounts. There is also a subsidiary question as to whether the profits should not be reduced by certain overhead costs of the construction firms." (Emphasis added)

In its brief filed on this petition for review, the Commission takes the position that it did not operate according to the "no-profits-to-affiliates rule" and that any reference thereto constituted legal shorthand for a "rule" of law that promoters of a corporation stand in a fiduciary relationship to it and that only such utility rates should be approved which will provide the company an opportunity to realize a reasonable return. Accordingly, it is contended that the question presented can be answered without reference to any "rule" or without use of the word "affiliate." Moreover, the Commission denies the petitioners' assertion that it ruled "automatically" or "without factual inquiry."

Section 6(a) of the Natural Gas Act, 15 U.S.C.A. § 717e(a), gives the Commission authority to "ascertain the actual legitimate cost of property of every natural-gas company" when determining cost-of-service as it relates to rate-making. In the past—as indicated by the Commission opinion printed in part above—the Commission has excluded from "actual legitimate cost" those profits paid by a company to any other with which it is, either directly or indirectly, in a "control" relationship.[5] This practice has become known as the "no-profits-to-affiliates" rule. The rationale behind the rule is relatively simple and highly pragmatic. If the relationship between two contracting parties is so close that they lose their individual identity and are, in fact, *one*, there

5. In St. Croix Falls Minnesota Improvement Co., et al., 3 F.P.C. 13, 16 (1942) (footnote 4), the Commission stated it uses the term "affiliated company" synonymously with the term "associated company" as defined in the Commission's uniform System of Accounts:

"5.A. 'Associated companies' means companies or persons that directly, or indirectly through one or more intermediaries, control, or are controlled by, or are under common control with, the accounting company.

"B. 'Control' (including the terms 'controlling', 'controlled by,' and 'under common control with') means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a company, whether such power is exercised through one or more intermediary companies, or alone, or in conjunction with, or pursuant to an agreement, and whether such power is established through a majority or minority ownership or voting of securities, common directors, officers, or stockholders, voting trusts, holding trusts, associated companies, contract or any other direct or indirect means."

can be no "actual legitimate cost" involved in the payments of profits, since it would be tantamount to a company's paying *itself* a profit for interdepartmental services. See, e.g., St. Croix Falls Minnesota Improvement Co., et al., supra; Alabama Power Company, 1 FPC 25, 29, aff'd Alabama Power Company v. McNinch, 68 App.D.C. 132, 94 F.2d 601 (1937).

■ Here, of course, it is undisputed that neither Houtex nor the engineering and construction group actually *controlled* the other. There was admittedly an interlocking directorate (four "firm" men on Houtex' board of nine) and an intermingling of interests. While it may be true that the dealings between the parties involved did not meet the strictest standards required by "arm's length bargaining," it is not contended that they lost their true identity or that the relationship was such as to make them one.[6] Arm's length bargaining is a general term. There is no substantial contention that the transactions in question were consummated under conditions of collusion, fraud, gross neglect or undue influence. Unquestionably, FGT will have to carry the burden of justifying the reasonableness of the claimed costs, if "reasonableness" is a proper subject of inquiry under the facts and circumstances present. In our view, the record conclusively establishes that each of the principals involved was a clearly "identifiable" and independent entity, pursuing its individual business objectives at all times. Therefore, to apply the "no-profits-to-affiliates" rule to this set of circumstances, the Commission had to expand its traditional meaning, if not indeed create an entirely new rule.[7]

■■ Control is always a vital element to consider and determine. See Western Dist. Co. v. Public Service Comm. of Kansas, 285 U.S. 119, 52 S.Ct. 283, 76 L.Ed. 655 (1932); Smith v. Illinois Bell Telephone Company, 282 U.S. 133, 51 S.Ct. 65, 75 L.Ed. 255 (1930); Louisville Hydro-Electric Co., 1 FPC 130 (1933), affd sub. nom. Louisville Gas & Electric Co. v. FPC, 129 F.2d 126 (6 Cir. 1942), cert. den. 318 U.S. 761, 63 S.Ct. 559, 87 L.Ed. 1133. Mere influence arising out of business relationships where control is not present is not a proper standard. In any event, the Commission has the unquestioned right and power to investigate the reasonableness of the costs at issue with the usual thoroughness and expertise characteristic of its procedure and accounting methods; and undoubtedly such costs should and will be scrutinized with meticulous care.

As to the term "actual legitimate cost," the Commission interpreted the similar provisions of the Federal Water Power Act [now the Federal Power Act, 16 U.S.C.A. § 797(b)] in Louisville Hydro-Electric Co., 1 FPC 130, 139 (1933), to mean that costs "must be (1) *'actual'*, that is, real and *bona fide*, as distinguished from fictitious or fabricated, whether by intercorporate dealings or otherwise; and (2) *legitimate* meaning not coerced, collusive, fraudulent, or unreasonable * * *."

We fail to see why the profits in the instant case so clearly exceed the bounds of the definition the Commission itself has already set as to require automatic exclusion from cost-of-service. The profits were "actual" because *in reality* they flowed from one independent party to another. There was no "fiction" involved in their payment, as is true in case of payment to a subsidiary or parent. Furthermore, such costs were "legitimate" to the extent they were *necessary.*

6. The Government speaks of the relationship in terms of a "joint venture."

7. This latter alternative is substantiated by the Commission's statement in its opinion at 31 FPC 1408 that "the purpose of the rule is to prevent insiders taking advantage of their position and creating costs which are not subject to the check of ordinary business relationships. CF., Section 10 of the Clayton Act, 15 U.S.C.A. § 20 * * *" Our research fails to reveal any prior case in which this purpose was specifically expressed.

It would be unrealistic to assume that the engineering and construction firms would or could have done the work for Houtex without a profit, since together they never did own more than two-fifths of that company.[8] Whether or not the profits were "reasonable" is a decision the Commission must make without applying the "no-profits-to-affiliates" rule.[9]

For the reasons stated above, the Order of the Federal Power Commission excluding from Houtex' cost-of-service the profits paid to the engineering and construction firms must be vacated.

In view of our decision, we deem it unnecessary to consider petitioners' contention as to the "res judicata" effect of the Commission's prior order relating to the "reasonableness" of projected costs. Nor is it necessary to review the Commission's denial of petitioners' Motion for Rehearing or Motion to Re-Open the record to present further evidence.

Reversed and remanded to the Federal Power Commission for further consideration and proceedings consistent with this opinion.

8. It is significant to note that at the time when the construction and engineering firms owned 37½% of Houtex' stock that corporation was in the infant or planning stage. Later, on October 23, 1958, when the binding agreements for the engineering and construction services were signed by the parties, the interest of the engineering and construction firms had shrunk to less than 10%.

9. On the question of discouraging the development of pipeline projects the majority states:
"It has been suggested by the dissent that the effect of our decision here will discourage the promotion of pipeline projects by promoters pooling their interests. Of course, we have no such intention. We do not object to promoters making a profit on their investment of time, effort and financial resources in a developing pipeline enterprise. They will presumably realize this profit on the enhanced value of the shares of stock distributed to them. What we do object to is the engineering and con-

tracting promoter profiting a second time on contracts between themselves and the organization they are promoting at the expense of the gas consumers."
In his dissent Commissioner O'Connor expresses the opposite view:
"I conclude by noting that the majority's error of law is compounded by their error of judgment. I have serious apprehension that their decision, which negates the previous definition of affiliation and extends the no-profits rule into an undelineated area, will only have a deleterious effect on the public interest.
"This interest has often been served by projects which were the creative progeny of but a few promoters. These promoters, lacking the vertical integration of large companies, were forced to incorporate with scattered interests in order to metamorphose idea into actuality. As was only logical, representatives for these interests often became officers or members of the board of the infant corporation."