COMMITTEE OF CONSUMER SERVICES, Utah Department of Business Regulation, Division of Public Utilities, and Salt Lake County, Petitioners,

v.

PUBLIC SERVICE COMMISSION of Utah, Milly O. Bernard, Chairman, Olof E. Zundel, Commissioner, and Kenneth Rigtrup, Commissioner, Respondents,

Mountain Fuel Supply Company, a Utah Corporation, Wexpro Company, a Utah Corporation, and Alex Oblad, Harold Burton and Carlyle Harmon, Mountain Fuel Shareholders, Intervenors-Respondents.

No. 15835.

Supreme Court of Utah.

May 10, 1979.

Daniel L. Berman, Sp. Asst. Atty. Gen., James L. Barker, Stephen Randle, Asst. Attys. Gen., Marcus A. Theodore, Deputy Salt Lake County Atty., Salt Lake City, for petitioners.

G. Blaine Davis, Asst. Atty. Gen., Salt Lake City, for Public Service Comm.

R. G. Groussman, Robert S. Campbell, Calvin L. Rampton, Edward W. Clyde, Salt Lake City, for intervenors.

MAUGHAN, Justice:

Petitioners seek review of an order of the Public Service Commission approving an amended purchase and sale agreement, and an amended joint exploration agreement. Both of these were modified by the Commission. They related to Mountain Fuel Supply and its wholly owned subsidiary, Wexpro. The order is reversed and the matter is remanded for a hearing in accordance with the principles set forth in this opinion. All statutory references are to U.C.A.1953.

The order was predicated on the validity of the classification by Mountain Fuel of its utility and non-utility assets, and the conclusion the Commission had no jurisdiction over the non-utility assets and the transfer of those assets to a non-utility corporate entity. These conclusions were premised on the erroneous assumption there was no correlation or connection between the contributions by the ratepayers, through an annual exploration and development expense included in the rate base, and the ensuing benefits from this program.

The key to the nature of misunderstanding of the majority of the Commission is well expressed in the dissent of Commissioner Rigtrup, who stated:

> The Commission's Report and Order represents a fundamental abdication by the Commission of its statutory responsibility to protect the public interest. The result of this abdication, which allows the transfer to an unregulated company of well over $150 million worth of assets discovered and developed with funds provided by the ratepayers of this state, under prior order of this Commission, can only be characterized a regulatory outrage.

In the conclusion to his dissent, Commissioner Rigtrup stated:

> . . . I would conclude that the exploration acreage held by Mountain Fuel over the years was used or useful in its natural gas utility business, and should have always been classified as utility assets. The fact that revenues from 'oil' or other liquid hydrocarbons have become very significant during the last few years does not change the basic character of those assets. However, it appears that the shareholders of Mountain Fuel have come to expect an unregulated return from oil properties, for which the risk capital was largely derived in rates charged its customers as ordered by the Commission. . . .

In evaluating the order of the Commission, it is important to review the two avowed purposes of Mountain Fuel in creat-

ing Wexpro: first, to provide and maintain a vigorous exploration program in order that Mountain Fuel might secure natural gas reserves for the future; second, "to remove regulatory uncertainty from the non-utility properties of the company which has hung like Damocles [sic] sword over the properties and assets of Mountain Fuel since 1972."

The latter purpose was the consequence of a finding by the Commission, in a report and order of January 14, 1974, that the oil operations were so incidental to and inseparable from the production and sale of natural gas as to be part of Mountain Fuel's utility operations; and any other treatment would be purely arbitrary, conjectural, and speculative. The Commission had ordered the investments, revenues, and expenses of the oil operations be included in the appropriate utility accounts, for rate-making purposes. Subsequently, the Commission had rescinded the order for the "roll in" of the oil properties, but the findings were not rejected. These findings, in regard to the inseparable nature of the oil and gas operations, were the sword of Damocles Mountain Fuel sought to have beaten into a non-regulated oil derrick.

In the current order, in finding No. 42, the majority of the Commission concluded that the language of the January 14, 1974, Report and Order "with respect to the rate-payer risk, ratepayer rip-off and exploitation of Mountain Fuel customers is erroneous and should not stand as fact or law." The dissent responded it was unnecessary for the majority to overrule the prior order. The dissent stated:

. . . The attempt of Mountain Fuel to obtain a ruling in this case which it could not get in Case No. 6668 is not only an affront to the members of the former Commission, but should offend reasonable sensitivities of this Commission.

There are certain basic principles which should be reviewed prior to the evaluation of the positions of the contesting parties.

■ First, it is the duty of a public utility corporation to operate in such a manner as to give to the consumers the most favorable rate reasonably possible. This duty stems from the fact the State has conferred on the utility of the exclusive right to sell and distribute gas. As a consequence, the utility bears a trust relationship to its customers and must conduct its operations on that basis and not as though it were engaged in a private enterprise with no restrictions as to its income.[1]

■ Second, under the general concepts of public utility law, risk capital is provided by the investor; it is this group which bears the risk of loss as developer of a public utility. It is only to the extent the facilities developed are used and useful to the consumer that they are included in the rate base.[2]

■ Third, under the "no-profits-to-affiliates" rule, any amount paid as a profit by a company to any other with which it is directly or indirectly in a control relationship cannot properly be included in the rate base. The basis of the rule is that a profit made by an enterprise dealing with itself does not represent a cost. The rationale underlying this concept proceeds from a simple premise:

If the relationship between two contracting parties is so close that they lose their individual identity and are, in fact, one, there can be no 'actual legitimate cost' involved in the payment of profits, since it would be tantamount to a company's paying *itself* a profit for interdepartmental services. [Citations][3]

. . . Intracompany transactions cannot be used to create an artificial or

1. *City of El Dorado v. Arkansas Public Service Commission*, 235 Ark. 812, 362 S.W.2d 680, 683–684 (1963).

2. *Terra Utilities, Inc. v. Public Service Commission*, Utah, 575 P.2d 1029 (1978).

3. *Florida Gas Transmission Company v. Federal Power Commission*, C.A. 5th 1966, 362 F.2d 331, 335–336; *Utah Power & Light Co. v. Public Service Commission*, 107 Utah 155, 192, 152 P.2d 542 (1944).

inflated price to be charged consumers. . . .[4]

■ This Court would be remiss in its duty if it did not cite the findings of the Commission, wherein it is said Mountain Fuel has been permitted to pay itself a profit for interdepartmental services. Heretofore, under Mountain Fuel's classification system, when an oil well has been developed and has been placed in the non-utility account, the non-utility account has been credited with the field price of the associated gas rather than the cost of service price. Under the amended purchase and sale agreement, there is a provision for Mountain Fuel to purchase, at market price rather than cost of service, the gas discovered on properties acquired by Wexpro, other than transferred acreage and that which comes to it under the joint exploration agreement. This provision violates the "no-profits-to-affiliates" rule.

There are certain factual aspects which must be reviewed in order to understand previous rulings of the Commission and the patent inconsistencies in the current order. We now address them.

■ Mountain Fuel has maintained a utility account # 105 in which has been held the unexplored or wildcat acreage. These assets have been deemed used and useful in the utility business by the Commission and have been included as capital assets in the rate base. As previously noted a utility is usually precluded from including in the rate base any capital asset, until it is developed, and then only to the extent the asset is used and useful in rendering the consumer service.

The determination of the Commission that this undeveloped acreage was used and useful in the utility business was consistent with statutory provisions. Under 54–2–1(30), the definition of a public utility includes a gas corporation, where the gas is sold or furnished to any consumer within this state for domestic, industrial or commercial use. Under 54–2–1(18), the definition of a gas corporation includes every corporation and person owning, controlling, operating or managing any gas plant for public service, within this state, or for the selling or furnishing of natural gas to any consumer or consumers within this state for domestic, commercial or industrial use. The key definition is the statutory one of gas plant.

54–2–1(17) provides:

The term 'gas plant' includes all real estate and fixtures and personal property owned, controlled, operated or managed in connection with or to facilitate the production, generation, transmission, delivery or furnishing of gas (natural or manufactured) for light, heat, or power.

Under this broad definition, the undeveloped acreage may properly be deemed an asset of the gas plant, because it is owned to facilitate the production of gas.

As early as 1957, the Commission found funds for exploration and development were a just and reasonable expense as part of the utility function of Mountain Fuel. As a result the company maintained accounts # 795, # 796, # 797, # 798 as utility expense accounts. Covered under these direct exploration expenses were costs for lease maintenance (delayed rentals), non-productive well drilling (dry hole exploration), abandoned leases, and other authorized exploration expenses. Since 1960, $44,981,000 has been authorized by the Commission as a utility exploration expense, which has been reflected in the rates and charges for the sale of natural gas. Between 1966 and 1976, the utility expense account paid for 73.3 percent of dry hole exploration and the non-utility account paid 26.7 percent of this expense. The utility expense account paid 95 percent of the cancelled and delayed rentals on leases and the non-utility account paid 5 percent of this expense. Of the total exploration expenses for the ten year period, $37,250,000 was paid from the utility account, and $8,222,000 was paid by the non-utility account. It was not until 1972 that the Commission ordered the non-utility account to pay a

4. *Cities Service Gas Company v. Federal Power Commission*, C.A.10th 1969, 424 F.2d 411, 416.

portion of the exploration and development expenses; that year this account was ordered to bear $300,000 of the expense. In 1974, the non-utility account was ordered to pay 32.88 percent of this expense, and in 1975 the amount was increased to 50 percent.

Thus, as early as 1957, the traditional principles of utility law were modified by the Commission, e. g., generally the investor supplies the risk capital and sustains the losses in a speculative venture; the ratepayer only pays a return on that portion of the investment which is found used and useful in rendering the utility service. Although the exploration and development costs which were reflected in the rates and charges were characterized as a just and reasonable expense of the utility by the Commission, these charges were, in effect, a capital contribution to a speculative venture for the purpose of developing oil and gas sources. However, these charges can be justified under the broad statutory definition of a gas plant insofar as they are used to develop property owned, controlled, operated or managed by the gas corporation, to facilitate the production of gas.

What are the consequences to Mountain Fuel of the ratepayers being the primary source of the risk capital throughout the years? Mountain Fuel responds that the consumer benefits by being assured of a continuing supply of gas, at cost of service prices.

This response is insufficient, since under the statute the charges for exploration and development can be sustained only if they were utilized on property held as a utility asset, and the property remains classified as a utility asset after it is developed. This is so regardless of the nature of the hydrocarbons recovered. Mountain Fuel sustains a trust relationship to its customers, and it has a duty to conduct its operations in such a manner as to give to the consumers the most favorable rate reasonably possible. When the expenses to develop the utility properties were included in the rate base, the ratepayers were entitled to share in the benefit by having the net profits on the oil, and other hydrocarbon substances, sold by Mountain Fuel to others, applied to reduce the cost of gas.[5]

Mountain Fuel, according to the findings, developed a system of classification based on custom or usage. This classification was never reduced to writing by either the utility or the Commission. If the exploration and development produced a successful well, it was classified as oil or gas based on the "value of production." This system involved measuring the product at the well head, or field separator facility, and then comparing the field price of gas and oil. Whichever substance had greater value determined whether the site was a gas or an oil well. Thus, any disparity between gas and oil prices at the time of classification could play a decisive role in determining whether it was a gas or an oil well. If it were a gas well, the drilling costs were capitalized and the well was held in a utility account, and any incidental gas and oil sales were credited to a utility account. If it were an oil well, the drilling costs were capitalized and held in the non-utility account; any associated gas was credited at field price to the non-utility account. In addition, any acreage logically related to the discovery was transferred and capitalized in the corresponding account.

There is another aspect of the classification system which requires explanation. The substances in the reservoir or at the surface may be in either a gaseous or liquid state. These substances are passed through a surface separator which separates the primary gases from the primary liquids. The primary liquids are referred to as "separator liquids" or "stock tank liquids." The primary gases are referred to as "separator gas." The separator gas is then treated to remove what is commonly known as natural gas liquids; these are sold by the barrel at a price not regulated by the Commission. Gas is a hydrocarbon product, which under normal industrial standards is capable (after removal of contaminants) of being in-

5. *Re Pacific Gas and Electric Company*, 97 P.U.R.3d 321, 335 (1973).

troduced into a natural gas transmission system and sold as distributor natural gas. Oil is all other hydrocarbon products, which are, under industry standards, normally introduced into a barrel or tank and sold in the market in such form. The Commission found these definitions had been employed by Mountain Fuel to separate utility products from non-utility, unregulated products. Mountain Fuel's definition was predicated upon the end use of the product and was not dependent upon the changeable or transitory nature of the effluent from its original state in the reservoir through the field separator.

■ The properties in the non-utility account, under this classification system, were the subject matter of the purchase and sale agreement. In its initial determination, the Commission limited the issue as to whether the properties in the non-utility account, which Mountain Fuel proposed to transfer to Wexpro, were properly held in this account under Mountain Fuel's system of classification. The Commission reasoned if they were non-utility properties under Mountain Fuel's classification, the Commission had no jurisdiction. The petitioners urged until there was an evidentiary hearing to determine whether, in fact, these properties were non-utility assets, there was an insufficient factual basis to determine the issue of the Commission's jurisdiction. We agree.

The classification of this property is of utmost importance, since this property is being transferred to Wexpro at a depreciated book value of $33.1 million. The claimed gross revenue from this property for 1976 was approximately $39 million. An expert from Mountain Fuel estimated the fair market value of the property at $150 million. If, in fact, after a hearing the property should be classified as a utility asset, the ratepayers by this transfer, would be deprived of benefits to which they are entitled.

The net effect of the Commission's initial determination was that their jurisdiction was based on Mountain Fuel's classification. This classification, in turn, was based on the value of production; and whether the substance was deemed gas or oil was based upon the end use of the product. There is no statutory or legal basis to sustain such a classification.

The patent inconsistency in the position of the Commission is clearly revealed in their rulings and order concerning the amended purchase and sale agreement. The rationale to support the transfer was these assets were in the non-utility account, because they were not used and useful to Mountain Fuel in performing its utility function.

The order [6] permits the transfer to Wexpro of the non-utility oil properties and interests of Mountain Fuel as they existed on December 31, 1976. The Commission then ordered the gas in Brady-Weber formation, at blowdown, be reserved to Mountain Fuel. Mountain Fuel would reimburse Wexpro to the extent of the depreciated book value of wells utilized thereafter by Mountain Fuel to produce gas. Further, the gas reserves currently developed as utility wells at the Brady, Spearhead Ranch, Dry Piney and Birch Creek Fields were reserved to Mountain Fuel. The order further provided Mountain Fuel should receive all of the natural gas from production which was currently available to its system, from the transferred properties, at cost of service. There was also a provision that Mountain Fuel would own all gas produced and sold from the transferred properties after January 1, 1977.

These provisions are tantamount to an evidentiary finding that these transferred "non-utility properties" were used and useful to Mountain Fuel in performing its utility function; therefore, they should be classified as utility properties.

Another interesting aspect of the order concerning the purchase and sale agree-

---

6. Where reference is made to the order of the Commission, the language used in its description is largely drawn from the order itself. Such accounts for its somewhat obtuse and convoluted nature.

ment is a provision that the income, costs and expenses, associated with the extraction of natural gas liquids from the gas stream by natural condensation, or further processing, after field separation, should be shared equally by Mountain Fuel and Wexpro. The effect of this order is to modify the definitions of gas and oil; yet the transfer to Wexpro of non-utility properties is sustained. The inconsistency arises because the product classification under which Mountain Fuel determined whether it should be included in the utility or non-utility account is modified. Yet the transfer of properties classified by Mountain Fuel's system is sustained.

The order further provided as to properties acquired by Wexpro, other than the transferred acreage, and those properties which would come to it under the joint exploration agreement, Mountain Fuel would have a right of first refusal to purchase gas at market price. Under the order concerning the joint exploration agreement, it is provided if an oil well is discovered, the well will be capitalized in Wexpro's accounts, and Mountain Fuel shall pay Wexpro the cost of service price for the production of any associated gas.

A review of the provisions of the two agreements as modified by the Commission clearly indicates that, by the activities performed by Wexpro, it becomes a public utility subject to the jurisdiction and regulation of the Commission under Sec. 54–2–1(30).[7] Wexpro, by its joint activities with Mountain Fuel, particularly upon the transferred properties is both performing a service, viz., facilitating the production of natural gas, and delivering natural gas to its parent, both of which constitute Wexpro a public utility.

■ The Commission, in effect, recognized the utility functions performed by Wexpro by the provision in its order requiring Wexpro to cooperate in preparing the annual report and accounting of exploration and development activities, including expenses, capital costs, and revenues associated therewith on properties under, or affected by, the purchase and sale and joint exploration agreements.[8]

■ The order approving the amended purchase and sale agreement must be reversed, and there must be an evidentiary hearing. The Commission must reassess the transfer and determine whether the properties were utility assets. The following is the criteria by which the properties should be classified:

(1) Was the property, while undeveloped, held in the utility capital account (Account # 105), upon which a rate of return was paid by the ratepayers?

(2) Were any funds from the utility exploration and development expense accounts (Accounts # 795, # 796, # 797, and # 798) applied to the development of the acreage?

(3) Has any natural gas or natural gas liquids been produced from the acreage?

■ If the answer *to any* of these is in the affirmative, the assets are utility property. Any transfer of a utility asset should be for fair market value so an appropriate benefit therefrom will redound to the credit of the ratepayers. Furthermore, before approving the transfer of a utility asset, the Commission should determine whether the transaction is detrimental to the ratepayer, and whether it is in the public interest.

The language of the Michigan Public Service Commission in *Re Michigan Consolidat-*

---

7. The applicable provisions therein state:

 . . . when any person or corporation performs any service for or delivers any such commodity to any public utility herein defined, such person or corporation, and each thereof, is hereby declared to be a public utility and to be subject to the jurisdiction and regulation of the commission and to the provisions of this title. . . .

8. There is further posed the serious issue of whether it is in the public interest for Mountain Fuel to divide its utility function between itself and a subsidiary. Relevant factors to be considered in this inquiry include any potential administrative inconvenience caused by the necessity of regulating two corporate entities performing, in essence, a singular utility function; and additional costs and expenses affecting the rate base.

*ed Gas Company*[9] is particularly appropriate to explain the operative principles of this case. The Commission stated:

Michigan Consolidated has for many years been engaged in an exploration program to discover gas producing fields. This commission has during this period allowed Michigan Consolidated to include gas exploration costs in its 'cost of service' as a legitimate part of its expenses properly chargeable to its utility customers.

In its exploration program, Michigan Consolidated did not deliberately set out to discover only oil or only gas fields. It secured leases and drilled wells where geological or geophysical service indicated some promise of either event. Thus, discovery of oil fields was not by design, but rather by accident and incidental to its gas exploration program.

Michigan Consolidated developed oil production in the Big Hand field in 1963 and discovered the Hardy Dam oil field in 1966. As is the case with most so-called oil fields, these reservoirs contain both oil and gas, and both flow or are pumped through the same wellbores to the surface where the oil and gas are separated. In these fields, the resultant oil is sold to refineries. Some of the gas is used for field purposes and the remainder is vented. Michigan Consolidated's management decided to treat these production facilities as nonjurisdictional and take the profits therefrom 'below the line' to inure to the benefit of its stockholders.

The record shows that the gas utility customers have already paid the exploration expenses leading to the development of these oil production properties through the cost of maintaining an active geological and reservoir engineering staff, obtaining leases, and drilling exploratory wells. Until these exploratory wells are drilled, it is not possible to determine whether the ultimate production from a particular lease will be oil or gas, or both. Moreover, Michigan Consolidated has charged some dry holes related to oil pro-

duction to its gas operations, while venting gas produced with the oil. We also consider it significant that gas which has been vented from the wells producing oil in the Big Hand field will soon be gathered and ultimately utilized by Michigan Consolidated in serving its gas utility customers.

Consequently, we find that these oil production facilities cannot be considered as a separate non-utility operation, but are incidental to the natural gas exploration program and a part of Michigan Consolidated's gas utility operation. For these reasons, Michigan Consolidated's investment in these oil production facilities, as well as the revenues and expenses associated therewith, should and shall be treated and recorded as utility plant and utility operations for rate-making and accounting purposes.

■ In light of the potential loss of the properties transferred to Wexpro under the purchase and sale agreement, it is equitable that Wexpro be relieved of the obligations, if it so desires, it has undertaken in the joint exploration agreement. This latter agreement contains certain infirmities since its format follows Mountain Fuel's former system of classification of utility and non-utility properties, with the minor modification imposed by the Commission concerning natural gas liquids.

Under this agreement all acreage is held by Mountain Fuel, excepting oil producing acreage held by Wexpro. All exploration and development expenses up to $6,240,258 annually are shared equally by Mountain Fuel and Wexpro. If a gas well is discovered, Mountain Fuel pays for the costs and capitalizes it in the utility account in which it holds developed property. All oil from such a well is owned by Wexpro and obtained at cost of service of production. Acreage logically related to the well is capitalized in Mountain Fuel's utility account. The same terms apply to Wexpro, if an oil well is discovered. The classification of a well is based upon the value of production

9. 78 P.U.R.3d 321, 323–324 (1968).

of each commodity for a thirty day test period. Mountain Fuel pays no drilling expenses on any acreage held by Wexpro. Wexpro pays fifty percent of the drilling expenses on acreage held by Mountain Fuel in its utility plant in service account; if such a well is successfully completed it is classified as a gas or oil well in accordance with the agreement.

■ The joint exploration agreement, of course, does not identify the source of the exploration and development funds contributed by Mountain Fuel, viz., whether they are included in the rate base as an expense. Furthermore, the agreement does not reveal whether the account in which Mountain Fuel holds the undeveloped acreage is included in the rate base upon which a rate of return is permitted. Nevertheless, since exploration and development is a utility function to facilitate the production of gas, Mountain Fuel should receive all hydrocarbons produced to the extent of its proportional share of its contributions. Mountain Fuel's investments, revenues, and expenses arising out of the joint exploration agreement should be included in the appropriate utility accounts for rate-making purposes.

Finally, Mountain Fuel claims the adoption of any other system of classification of their assets (than the one they advance), would constitute a confiscation of property without due process of law. This claim is without merit. Mountain Fuel's classification was arbitrarily selected, without reference to the relevant statutory provisions previously cited in this opinion.

Mountain Fuel, in fact, would not be deprived of any property by a more realistic classification system; it would yet receive the receipts from the sale of oil. The classification of assets as utility or non-utility is strictly an accounting procedure, to reflect the reality of the situation, and no confiscatory aspect is involved. There are elements of fantasy involved in the claim that a utility asset, which has been held and developed as a utility expense, undergoes a transfiguration into a non-utility asset by virtue of the value of the type of hydrocarbons recovered. To claim the "oil" operations constitute a separate business is a straw man to distract the unwary. If the assets involved, under the tests set forth in this opinion, be utility assets, they are subject to regulation.

Where an activity or business is affected with the public interest, the courts have universally held that to subject such activity or business to regulation does not violate either the Fifth Amendment or the Fourteenth Amendment of the Federal Constitution. [Citations] . . .[10]

ELLETT, C. J.,* and CROCKETT and HALL, JJ., concur.

STEWART, J., does not participate herein.

WILKINS, Justice (dissenting):

I respectfully dissent.

I shall relate extensively my view of the nature of this case, as well as the facts, historical background, analysis of the issues, and law applicable thereto.

Petitioners appeal from the Final Report and Order on Rehearing of the Public Service Commission of Utah, dated April 11, 1978, in what has come to be known as the "Wexpro case." This final Order determined that the Commission's regulatory jurisdiction did not extend to property transferred from Mountain Fuel Supply Company, a Utah corporation whose utility activities are regulated by the Public Service Commission, to Wexpro Company, Mountain Fuel's wholly owned subsidiary. The transferred property had been previously held in Mountain Fuel's "non-utility" accounts.[1] The Order also ruled that the

---

10. *Natural Gas Service Co. v. Serve-Yu Cooperative, Inc.*, 70 Ariz. 235, 219 P.2d 324, 329 (1950).

* Chief Justice Ellett had so acted in this case prior to his retirement; and also continues to participate at the request of the Court.

1. "Non-utility accounts" or "non-utility operations" refer in this dissent only to Mountain Fuel's oil and related businesses. Mountain Fuel owns and operates other businesses not related to its gas and oil production.

Commission's regulatory jurisdiction did extend to the Joint Exploration Agreement (hereafter JEA) and the Agreement of Purchase and Sale (hereafter P&S) executed between Wexpro and Mountain Fuel to the extent that the Commission can regulate the sale of natural gas to a utility in this State, and that subject to the Agreements being amended as ordered by the Commission, they were in the public interest. The Order also reduced to writing and expressly approved a gas-oil classification, which, as discussed herein, is critical to the jurisdictional issue in this case.

Petitioners urge this Court to rule that the properties transferred to Wexpro are under the regulatory jurisdiction of the Commission, that the JEA and P&S are not in the public interest (since they adopt Mountain Fuel's gas-oil classification which defeats jurisdiction over the Wexpro properties), and that under the principle of "gain follows risk," the benefits arising from Wexpro's oil operation should be credited to Mountain Fuel's ratepayers. All statutory references are to Utah Code Annotated, 1953, as amended, unless otherwise specifically indicated.

In 1935, five small companies were merged to form Mountain Fuel. One of the companies produced oil, and its assets were categorized as non-utility and carried in accounts separate from the utility accounts which covered the four gas-producing companies. Mountain Fuel subsequently adopted and has consistently used the Uniform System of Accounts for Natural Gas Companies promulgated by the Federal Power Commission in 1940.

As Mountain Fuel's exploration and development program expanded, it discovered gas wells and oil wells and some wells which produced both. Although it discovered much more gas than oil it became necessary for Mountain Fuel to classify the wells which produced both as either gas or oil so it could assign them to the appropriate utility or non-utility account. Essentially gas

was categorized as that hydrocarbon product which was capable, after contaminants and liquids were removed, of being placed in a natural gas pipeline for transmission and distribution. Oil was defined as all other hydrocarbon products which before or after treatment were, under industry standards, normally sold and transferred in a container or tank and delivered to a refinery.

Actually this definition applied only in mixed well classifications, which constituted a small percentage of the producing wells. For example, in the ten year period from 1966 to 1976, Mountain Fuel drilled 163 successful wells and only 22 contained both gas and oil. Of those, only one had as close a ratio between gas and oil production as 60 percent to 40 percent. The other 21 had ratios of over 70 percent to 30 percent for either gas or oil. This ratio was determined by examination of the hydrocarbon stream when processed in a separator at the well head. If the value of the natural gas in the well exceeded that of the oil, the well was classified as a gas well. All associated expenses for drilling and completing the gas well were capitalized in the # 101 utility account. If the well was classified an oil producer, all associated expenses were capitalized in the # 121 non-utility account.

The Commission approved this accounting system, ruling it did not have jurisdiction over the non-utility accounts in June, 1948 (P.S.C. Case 3275), November, 1953 (P.S.C. Case 3972), February, 1957 (P.S.C. Case 4392), July, 1968 (P.S.C. Case 5907), and in February, 1972 (P.S.C. Case 6369). The classification system was challenged more vigorously in this decade, when the non-utility oil accounts became enormously valuable as a result of the Organization of Petroleum Exporting Countries' ("OPEC") oil management and pricing policies which had material impact in 1973 and following years.

Mountain Fuel's exploration and development program has also been under attack in

this case. Through equity and debt financing and retained earnings, Mountain Fuel has raised investment capital to purchase or lease unexplored acreage. This acreage was held for future use in Mountain Fuel's # 105 utility account. Acreage in this account was treated as a capital cost, and Mountain Fuel's annual exploration and development expense, included in the rate base, was never used to finance its acquisition. The acreage in this # 105 utility account has been included in the rate base, as a capital asset, to the extent that consumers paid a rate of return to shareholders on their investment in that property.

From its formation, Mountain Fuel has maintained an aggressive and extensive exploration program.[2] It produces over 30 percent of its entire system's requirements, one of the highest percentages in the United States. This gas comes to consumers at cost of service, or about $.40 per Mcf (thousand cubic feet), rather than market price, which averaged $1.17 per Mcf in 1977, or pipeline price, which in 1977 was $1.48 per Mcf. Petitioners do not dispute Mountain Fuel's testimony that its Utah customers pay the lowest, or among the lowest, rates of any gas utility customers in the country. To develop this low-cost gas and the reserves, the Commission has allowed Mountain Fuel to reflect as one of its operating costs, an exploration expense in its rate base. Like other costs in the rate base, this exploration and development expense was paid from general corporate resources, not a special, earmarked development fund. This exploration expense paid for such items as delay rentals on exploration acreage, abandoned leases, geophysical work, and nonproductive well drilling, or dry holes. It did *not* pay for the initial lease *or* purchase acquisition, successful well drilling costs, completion costs, producing costs, costs to connect the well to a pipeline, or costs to construct and maintain pipelines. These latter costs, being capital costs, were borne by Mountain Fuel through equity and debt financing and retained earnings.

Exploration expense money was used to develop acreage held in the # 105 utility account. If exploration resulted in a gas discovery, the project costs to that point were not expensed or deducted in the year incurred, but were spread prospectively over the estimated well life after transfer to the utility # 101 account by capitalizing those costs and taking deductions for each year's depreciation and depletion. So, the costs of successful wells were never included in the money allotted as annual exploration and development expenses. It is the cost of lease maintenance, geophysical work, and, most importantly, dry holes, included in the rate base, which is disputed here. The Commission heard conflicting testimony on whether or not the non-utility operations paid part of the exploration expenses prior to 1972. Mountain Fuel's exhibits, including certified audit reports, show that between 1960 and 1970 the non-utility operations had paid $430,544 for dry holes, or 3.2 percent of the total exploration expenses of the company. During that same period, the revenues attributable to the non-utility accounts constituted 3.1 percent of the total company revenues. Petitioners, on the other hand, maintain that prior to 1972 the non-utility accounts paid nothing toward expense for dry holes.

In 1972, the Commission reviewed the relationship between the utility and non-utility accounts and ordered the non-utility accounts to pay $300,000 of the annual exploration expense. In that year the non-utility operations of Mountain Fuel took on added significance with oil discoveries in Brady, Spearhead and Dry Piney Fields. Prior to 1972, the non-utility revenues were relatively minor in comparison to the natural gas revenues. In 1973, oil values increased markedly because of OPEC increases and the energy shortage. In 1974, after further review by the Commission, the non-utility operations were ordered to pay 32.88 percent of that part of the exploration and development cost which was expensed annually, while the utility accounts were to

---

2. *In its reserve system alone, which has 1.6 trillion cubic feet of natural gas, Mountain Fuel* has added 615.9 billion cubic feet which are directly attributable to its own production.

pay 67.12 percent. In 1975 the Commission ordered the utility and non-utility operations to share equally this cost.[3] Thus, while petitioners complain that from 1966 to 1976 the utility accounts paid 81.9 percent of the total annual exploration expense (including dry holes and other sub-categories) while the non-utility accounts paid 18.1 percent, it is also true that for the past three years the utility and non-utility accounts were ordered to pay equally. It is interesting to note, however, that the non-utility accounts actually paid *more* than the utility accounts during the past three years. Petitioners' own exhibit shows that from 1974 to the date of the Wexpro transfer (in 1976), the non-utility accounts contributed $6,600,000 to the dry hole expense while during that same period the utility accounts contributed only $4,245,000. No petitions for Commission rehearing or judicial review were taken from the 1972, 1974 or 1975 Orders claiming the Commission's allocations were unreasonable or unfair to the ratepayers. Further, petitioners did not in the Wexpro hearings, seek relief from the allocations made in those previous Orders, and of course, in my opinion, could not, even if relief had been sought, attack those allocations as a basis for their relief here.

In the 1973 and 1974 hearings, the Commission was urged to consolidate Mountain Fuel's non-utility and utility accounts for rate-making purposes. It finally did so in its January 14, 1974 Order on the basis that the oil and natural gas operations were inseparable from each other. Trading in Mountain Fuel's stock was suspended the following day to prevent what Mountain Fuel characterized as financial disaster. One week later the Commission entered an Order setting aside that part of the January 14 Order merging the non-utility and utility accounts. It did not, at that time, set aside its January 14 findings. The Commission also granted a petition for rehearing, and on July 18, 1974, entered a final Order affirming the January 21, 1974 Order. This Order still did not reverse the January 14 findings, but it did hold that if the January 14 findings were inconsistent with any subsequent Order of the Commission, and specifically the July 18 Order, such subsequent Order would "take precedence and be controlling."

The Commission has continuing jurisdiction over public utilities, and it is not necessarily bound by its prior rulings or by rulings of Commissions in other states.[4] "Public interest" is a standard of public utility regulation, and since what is found to be in the "public interest" may change in different circumstances and under different facts, the Commission must always be free to regulate by law the utility to achieve results which benefit the public. Significantly, no petition for certiorari to this Court was taken asserting the inconsistency of the January 14, 1974 findings with the January 21 or July 18, 1974 Order,[5] and in the Final Order in the Wexpro case, the Commission found that

> for the purposes of Case 6668, [the January-July 1974 Hearings and Orders] the rationale of the January 14 order was impliedly if not expressly set aside and overturned . . . and in light of the foregoing Findings and Conclusions, the Commission concludes that the language of the January 14 Report and Order in Case No. 6668 with respect to the ratepayer risk, ratepayer rip-off and exploitation of MOUNTAIN FUEL customers is erroneous and should not stand as fact or law. All prior and subsequent Orders of the Commission reached an opposite con-

---

**3.** Under the Amended P&S and Amended JEA, Mountain Fuel and Wexpro share equally all expenses for dry holes drilled on acreage held by Mountain Fuel, and Wexpro pays all expenses for dry holes drilled on acreage transferred to it under the Amended P&S and JEA.

**4.** 2 Davis, Administrative Law Treatise, § 17.07 at p. 530; *Mulcahy v. Public Service Commission*, 101 Utah 245, 117 P.2d 298 (1941); *accord*

*Utah State Board of Regents v. Utah Public Service Commission*, Utah, 583 P.2d 609 (1978); 79 A.L.R.2d 1131.

**5.** This Court reversed the Commission's order in *Parowan Pumpers Association v. Public Service Commission*, Utah, 586 P.2d 407 (1978) for inconsistency between the order and the findings.

clusion based on a correct balancing of the interests of customers and shareholders of the company and this Commission herein affirms that long line of precedent.[6]

The Commission's explanation and conclusion in this Final Order in 1976 regarding the findings and orders in 1974, do not, I believe, infuse the right of appeal into these 1974 findings and orders. Nor do my comments in this dissent concerning continuing jurisdiction of the Commission lend themselves to an infusion. To decide otherwise would indeed violate rules of appellate review.

Regulatory jurisdiction over the non-utility operations has continued to be at issue in every Mountain Fuel rate case since 1974. This has resulted in substantial shareholder unrest as well as uncertainty in the capital markets. Early in 1976, some Mountain Fuel shareholders waged a proxy battle for control of the company, the central issue of which was the continued attack on the non-utility properties. The Commission in this case heard testimony that Mountain Fuel was unable to market a $20,000,000 common equity issuance of stock because of this uncertainty, and that Wexpro has also been unable to engage in capital financing. As long as Mountain Fuel remains a publicly held, capital intensive corporation, its financial capabilities are of extreme importance to the Commission. The evidence before the Commission disclosed that it is imperative that Mountain Fuel be able to finance its capital expenditures, for when the company falters, rates increase, utility services deteriorate, and the gas customer suffers. In short, the Commission found that a financially distressed utility benefits no one, least of all those who will have to depend on its services in the future.

To alleviate this regulatory uncertainty and to encourage successful re-entry into the capital markets, Mountain Fuel formed Wexpro, and it was for these reasons that the Commission found the Amended P&S and Amended JEA to be in the public interest.

The scope of this Court's review of the Wexpro proceedings should be governed by Sec. 54-7-16, and cases decided thereunder. This section provides for application for a writ of certiorari to determine the "lawfulness" of the order or decision of the Commission. It also states:

. . . No new or additional evidence may be introduced in the Supreme Court, but the cause shall be heard on the record of the commission as certified by it. The review shall not be extended further than to determine whether the commission has regularly pursued its authority, including a determination of whether the order or decision under review violates any right of the petitioner under the Constitution of the United States or of the state of Utah. The findings and conclusions of the commission on questions of fact shall be final and shall not be subject to review. Such questions of fact shall include ultimate facts and the findings and conclusions of the commission on reasonableness and discrimination.

Case law interpreting this statute is extensive and explicit. Of original importance is *Mulcahy v. Public Service Commission, supra*, wherein the Court wrote:

In the language we used on the former application (*Fuller-Toponce Truck Company v. Public Service Commission*, 99 Utah 28, 96 P.2d 722, 726): "Whatever may be our opinion as to whether the commission found well or wisely, or whether our conclusions on the evidence would have been the same, we are bound by the findings, when there is evidence to support them."

. . . . .

What policy should be pursued, or what conclusions should be drawn from disputed facts is not a law question for the judiciary to decide. Such questions must be determined by the person or body

---

**6.** *Committee of Consumer Services, et al. v. Wexpro Co., et al.*, P.S.C. Case 76–057–14 at 3395–97 (1978).

whose action depends upon the determination thereof. But the question as to whether there is competent evidence to justify the action taken, or to be taken, is a legal question because the official body is authorized to act only according to law, that is, upon competent evidence. An attempt therefore to act upon a matter without any competent evidence to sustain it is not done according to law, and therefore is not done in the pursuit of lawful authority.

.    .    .    .    .

.   .   . It is not required that the facts found by the Commission be conclusively established, nor even that they be shown by a preponderance of the evidence. If there is in the record competent evidence from which a reasonable mind could believe or conclude that a certain fact existed, a finding of such fact finds justification in the evidence, and we can not disturb it. [Citations] [7]

By far the most common test mandated in the cases is that there must be substantial, credible and competent evidence (hereafter, in this dissent, "evidence", used repeatedly, means "substantial, competent and credible" unless otherwise indicated) to support the decision of the Commission.[8] Although Sec. 54–7–16 states that the findings and conclusions are final and not subject to review this Court has authority to determine whether the Commission's findings were arbitrary or capricious, and therefore contrary to law,[9] and can remand to the Commission when its Order is inconsistent with its findings.[10] This Court can review whether any constitutional rights of the complaining party have been invaded or disregarded and whether the Commission has exercised its authority pursuant to law.[11] Essentially, I believe, "scope of review" is the index to this Court's jurisdiction in this case.

Petitioners argue the Commission violated their rights to due process and procedural fairness, and they argue the Commission erred as a matter of law interpreting the statutes of this State to exclude Wexpro's property from its regulatory jurisdiction. Finally, they argue that the Commission erred in its determination that the Amended JEA and P&S were in the public interest because the Commission failed to adopt the principle advanced by them of "gain follows risk."

The central question here, I submit, is whether the Commission correctly ruled that it did not have jurisdiction over the Wexpro properties. This question is divided into two issues; first, whether the Commission correctly interpreted the jurisdictional statutes of our Public Utilities Code, and second, whether the Commission erred in adopting Mountain Fuel's gas and oil classification.

Petitioners' principal jurisdictional argument rests on a construction of Sec. 54–4–1, as modified by Subsection (30) of Sec. 54–2–1. Sec. 54–4–1 states in broad terms:

General Jurisdiction.—The commission is hereby vested with power and jurisdiction to supervise and regulate every public utility in this state, and *to supervise all of the business of every such public utility* in this state, and to do all things, whether herein specifically designated or in addition thereto, which are necessary or convenient in the exercise of such power and jurisdiction. [Emphasis added.]

Subsection 54–2–1(30) is a definitional section and provides in pertinent part:

.   .   . Any corporation or person not engaged in business exclusively as a public utility as hereinbefore defined shall be

---

**7.** 101 Utah at 265, 250, 249, 117 P.2d at 306, 300, 299.

**8.** *Los Angeles & Salt Lake Railroad Co. v. Public Service Commission*, 121 Utah 209, 240 P.2d 493 (1952).

**9.** *Greyhound Lines, Inc. v. Public Service Commission*, Utah, 547 P.2d 199 (1976).

**10.** Supra, note 5.

**11.** *Salt Lake City v. Utah Light and Traction Company*, 52 Utah 210, 173 P. 556 (1918); *Terra Utilities, Inc. v. Public Service Commission*, Utah, 575 P.2d 1029 (1978).

governed by the provisions of this title in respect *only to the public utility or public utilities owned, controlled, operated or managed* by it or by him, and *not in respect to any other business or pursuit.* [Emphasis added.]

One statute seemingly vests jurisdiction, not simply over Mountain Fuel, but over all the businesses of Mountain Fuel, including Wexpro; however the second clearly limits Commission jurisdiction to Mountain Fuel's utility business. Petitioners urge that Sec. 54–2–1(30) should be read to exclude from the regulatory scheme only business "unrelated" to Mountain Fuel's utility activities. Since the Commission acknowledged that gas and oil may be discovered together, the argument continues, Mountain Fuel's oil properties are "related" to utility business activities and hence subject to regulation. Although petitioners contend their interpretation may be a reasonable one, it is not one, in my opinion, that the Legislature mandated, nor is it one this Court should feel empowered to impose judicially.

If it is reasonably possible to construe the statutes harmoniously, then we should not, of course, interpret discord between them. One reasonable reading of the statutes discloses no conflict between them. Both refer to the business of a "public utility." Sec. 54–4–1 must, by definition, relate to the *utility activities and business* subject to the regulatory jurisdiction of the Commission, and Sec. 54–2–1(30) simply reiterates the mandate to the Commission that it supervise the business of a *public utility.* But even if fatal tension is assumed to exist between the two statutes, rules of construction require that a definitional or specific section should govern over the general one.[12] Sec. 54–2–1(30) is definitional and specific, and it modifies the scope of Sec. 54–4–1 to confine the Commission's jurisdiction to the public utility business of Mountain Fuel.

Under either of these analyses concerning the two statutes, it remains the initial and basic responsibility of the Commission to resolve factually, according to law, what is or is not a utility, and therefore to define what activities of the company are subject to regulation. In short, it is always within the purview of the Commission to examine the fact situation before it and determine whether its jurisdiction extends to that situation.

We note that the majority opinion does not comment on petitioners' interpretation of the jurisdictional statutes. Instead, it relies on what I perceive to be a forced analysis of Subsections 54–2–1(17), (18), and (30). Incidentally, this analysis was not argued before the Commission nor urged by the petitioners in their briefs on appeal.

Subsection 54–2–1(30), which defines the term "public utility," contains the term "gas corporation." The majority opinion, concerning this Subsection states: "the definition of a public utility includes a *gas corporation*, where the gas is sold or furnished to any consumer in this state for domestic, industrial or commercial use." (Emphasis added.) It further comments that Subsection 54–2–1(18) defines the term "gas corporation" as every corporation and person owning, controlling, operating or managing any *gas plant* for public service. That opinion then quotes Subsection 54–2–1(17), which broadly defines "gas plant" as

. . . all real estate and fixtures and personal property *owned*, controlled, operated or managed in connection with or *to facilitate the production*, generation, transmission, delivery or furnishing *of gas* (natural or manufactured) for light, heat, or power. [Emphasis added.]

It then determines that all undeveloped property which was held in the # 105 utility account is part of the gas plant since it was owned to facilitate the production of natural gas. And as part of the gas plant, the opinion continues, it was within a gas corporation, and as a gas corporation, it was a public utility. By this definitional chain, the majority opinion reasons that any and

12. 2A Sutherland, Statutory Construction, § 47.07 (1973); *Gallegos v. Midvale City*, 27 Utah 2d 27, 30, 492 P.2d 1335, 1337 (1972).

all property held in the # 105 utility account, including that property transferred to Wexpro under the Amended P&S and JEA, became and remained utility property. I disagree.

It seems to me that the reasoning of the majority opinion begs the vital question. Because the undeveloped property was initially placed in the # 105 utility account, the Court today assumes that we are compelled by Sec. 54–2–1(17) to conclude that that property became ". . . real estate . . . (which was) owned . . . to facilitate the production . . . of gas . . . ." and hence was and is utility property. But that bare assertion rests, in the environs of this case, on no legal or factual authority.

Why? The record undeniably reveals that Mountain Fuel, with the approval of the Commission, segregated its non-utility oil properties from its utility accounts from the beginning, and these properties were always treated as non-utility in nature and excluded from the utility account, rate base, and rate of return. And the initial inclusion of these properties, along with gas properties—when all properties were undeveloped acreage—into the # 105 utility account should not vitiate this traditional segregation, which has had consistent Commission approval, and thereby transform *now* the utility and non-utility businesses into one estate. The irony of mandating, in effect, this *merger is particularly striking,* I believe, when the very policy and precedent which allowed a utility and non-utility classification greatly contributed to producing the lowest, or among the lowest, gas rates to the ratepayers of Mountain Fuel in this country, as well as producing significant natural gas reserves. In short the very format of historical classification that was established, and followed, produced an exploration and development program which eventuated in signal benefits to the ratepayers, Mountain Fuel, and the stockholders.

The majority opinion later determines from another paragraph of Sec. 54–2–1(30) that Wexpro itself is defined as a matter of law as a public utility, quoting that section as follows:

> . . . when any person or corporation performs any such service for or delivers any such commodity to any public utility hereindefined, such person or corporation, and each thereof, is hereby declared to be a public utility and to be subject to the jurisdiction and regulation of the commission and to the provisions of this title.
>
> . . .

and concluding that Wexpro, in aiding Mountain Fuel in discovery and production of natural gas becomes a utility. However, I find such a broad reading to deprive of meaning our whole statutory scheme of regulation. It is just as easily argued, under this interpretation, that federally regulated pipelines, though rarely used and not even owned by Mountain Fuel, would fall within the perimeters of the Commission's jurisdiction, as would privately owned wells which sell gas to Mountain Fuel, as well as the attorneys who represent Mountain Fuel in this appeal. Rather, I believe it necessary to read this segment of Subsection (30) of 54–2–1 in full context:

> *Except, as hereinafter provided,* when any person or corporation performs any such service for or delivers any such commodity to any public utility herein defined, such person or corporation, and each thereof, is hereby declared to be a public utility and to be subject to the jurisdiction and regulation of the commission and to the provisions of this title. *Any corporation or person not engaged in business exclusively as a public utility as hereinbefore defined shall be governed by the provisions of this title in respect only to the public utility or public utilities owned, controlled, operated or managed by it or by him, and not in respect to any other business or pursuit.* [Emphasis added.]

An interpretation of the definition of a public utility, I submit, must be made in the light of more than that determined by the majority opinion.

Much of the testimony in the Wexpro rehearing consisted of definitions of gas

and oil and was also taken to review Mountain Fuel's classification system. Gas-oil classification is critical to the jurisdictional issue and to petitioners' case, since what the Commission defines as non-utility (oil) is outside the scope of its regulatory jurisdiction. Petitioners argue, and this Court today concludes, that by adopting Mountain Fuel's gas-oil classification, the Commission abdicated its jurisdictional fact-finding role and allowed Mountain Fuel to determine the extent to which it is regulated and the scope of the Commission's jurisdiction over it. The answer to this argument is fundamental: the Commission, after reasonable inquiry and hearings on the relationship between Mountain Fuel's gas and oil operations, entered findings of fact and conclusions on the gas-oil classification, and so long as they are substantiated by evidence and law, as I believe they are, this Court should not overturn them on appeal if it adheres to proper and traditional rules of appellate review.

All petitioners assert error in the Commission's adoption of Mountain Fuel's classification system, though during the rehearing below the positions of Petitioner Division of Public Utilities and Petitioner Committee of Consumer Services differed significantly. The Committee of Consumer Services requested the Commission to take judicial and administrative notice of the oil and gas conservation statutes of Utah, Wyoming and Colorado and to fashion gas-oil definitions from them. Petitioner Division of Public Utilities did not submit to the Commission its own definition of gas and oil. It instead took the position that all hydrocarbons, regardless of their nature, produced by Mountain Fuel or Wexpro should be divided evenly between them; or as an alternative, that Mountain Fuel should own all the natural gas and the natural gas liquids, and Wexpro should own the remaining hydrocarbons and the water collected from the separators on the wells.[13]

Mountain Fuel then introduced evidence on both its historic classification system, discussed previously in this dissent, and its proposed definitions of gas and oil.

Evidence was received and reviewed by the Commission on all of the proposals submitted by all of the parties. The Commission substantially ruled in favor of that classification system propounded by Mountain Fuel, and there is evidence, in my judgment, to support that determination. As long as there is evidence to support its decision, the Commission may choose among proposals. Simply because Mountain Fuel's evidence appeared the more convincing is no reason for this Court to now conclude that the Commission abdicated its regulatory responsibility and allowed Mountain Fuel to determine the scope of its jurisdiction.

The majority opinion cites *Re Michigan Consolidated Gas Co.*,[14] a case decided on somewhat similar facts, as directly contrary to the Commission's decision in Wexpro, and adopts it. One thing remains fatal to this Court's position: the Michigan Commission decided the case, choosing not to adopt the utility's evidence. Here, Utah's Commission found in accordance with the utility's evidence. In either case, so long as evidence exists to support the Commission's decision, that decision should stand from the point of view of factual determinations.

Petitioners must prevail on factual determinations, if at all, I believe, on the evidence produced at the Commission level, for this Court should not exceed *its* jurisdiction on review by directing that the Commission find and conclude against evidence sufficient to uphold its decision. The Commission retains continuing jurisdiction over Mountain Fuel's utility activities, and that company's utility business is always subject to Commission scrutiny. Further that scrutiny includes reasonable inquiry concerning

**13.** The Commission noted in its findings that the Division's alternative proposal was followed by Mountain Fuel, except that distribution of the natural gas liquids was historically credited to the utility or non-utility accounts, depending on the classification of the well producing them.

**14.** 78 Pub.U.Rep.3d (PUR) 321 (Mich.Pub.Serv. Comm'n 1968).

whether non-utility activities are in fact non-utility.

It is a continuing legitimate concern that Mountain Fuel's primary management objective is the discharge of its public utility obligation. The Commission did not and could not, in my view, abdicate its jurisdiction, authority, or responsibility to protect the public interest in this matter. If there had been demonstrated by the evidence a reasonable basis for believing that Mountain Fuel's exploration or other business decisions were oriented to Wexpro's success at the expense of the public interest for which Mountain Fuel is certificated, the Commission had the authority, and the duty,[15] to take corrective action.

The Commission determined that while it did not have jurisdiction over the non-utility properties transferred by Mountain Fuel to Wexpro, it does have jurisdiction to review and approve contracts entered into by Mountain Fuel with respect to utility functions of the company and to disapprove the same in one or more parts if it finds any such utility contract to be unjust, unreasonable, or not in the public interest. See Sec. 54–4–26,[16] which gives the Commission power to review contracts to which its regulated public utilities are parties. However, until the Commission, *not this Court*, is convinced by evidence of the correctness of a different classification system, the findings and conclusions of the Commission should be upheld.

Though the majority opinion does not address petitioners' contention that the Commission denied them due process and a full and fair hearing, I will do so. Their arguments, in essence, are first, that the Commission refused to expand the scope of the hearings beyond that required to determine

whether it had jurisdiction over Wexpro until *during* the rehearing, and then decided issues beyond the scope of that rehearing; and second, that the Commission based its Order in Wexpro on evidence in other hearings.

Key to notions of fairness and due process is both notice and an opportunity to respond. Throughout the hearings and rehearings in this case, petitioners frequently moved the Commission to expand the scope of the hearings beyond that necessary to determine whether it had jurisdiction over the Wexpro transfer. In July, 1977, petitioners requested a hearing on several Wexpro issues which the Commission subsequently granted in the General Rate Case (hereafter GRC) heard in August, 1977.

Having determined that it did not have jurisdiction over Wexpro in both its July 20 and August 29, 1977 Orders, the Commission granted rehearing to consider the P&S and JEA and Mountain Fuel's Amendments thereto, and to formulate a definition of gas and oil. At the beginning of the rehearing in September, 1977, the Commission in fact did expand the rehearing to allow every party to present its evidence on all issues relating to Wexpro. The rehearing, originally scheduled for two days, lasted eighteen days. Petitioners did not claim surprise, did not refuse to introduce testimony, and did not claim error in the Commission's ruling expanding the rehearing. Instead, each petitioner presented its case fully, called all its witnesses and introduced all the exhibits, plans and proposals it desired, and cross-examined the other witnesses. In closing arguments, petitioners argued the Commission should find on the issues raised by their evidence, reject the P&S and JEA and their Amendments, and require Moun-

---

**15.** *See* Sec. 54–3–1 and 54–4–1.

**16.** Sec. 54–4–26.
Every public utility when ordered by the commission shall, . . . with respect to any other expenditures, submit such proposed contract, purchase or other expenditure to the commission for its approval; and, if the commission finds that any such proposed contract . . . is not proposed in good faith for the economic benefit of such

public utility, the commission shall withhold its approval of such contract . . . and may order other contracts, purchases or expenditures in lieu thereof for the legitimate purposes and economic welfare of such public utility.
*Accord,* Sec. 54–4–4(2) and *Parowan Pumpers Association v. Public Service Commission, supra* note 5.

tain Fuel and Wexpro to execute contracts consistent with their versions of the evidence. They submitted orders for the Commission's signature consistent with their positions.

Now, on appeal, all claim error because the Commission decided issues beyond the scope of the hearing it originally ordered. Such claim, I believe, cannot stand. Sec. 54–7–1 provides in pertinent part:

> No informality in any hearing, investigation or proceeding, or in the manner of taking testimony, shall invalidate any order, decision, rule or regulation made, approved or confirmed by the commission.

Of course, if the informality or irregularities impair substantially the proceeding, they may well violate due process. Here, however, petitioners did not object to broadening the scope of the rehearing, and, indeed, accepted the opportunity to present their versions of the evidence. They argued persistently each and every fact they now appeal, concluding with a motion for further expansion of the rehearing on all the evidence. In connection with this last motion, Petitioner Division of Public Utilities indicated that substantially all of the evidence it intended to produce on the issues of classification and jurisdiction was, in fact, presented to the Commission during the Wexpro rehearing. Further, this petitioner's argument that it was deprived of due process of law is weakened by knowledge it gained as a result of its participation in outlining the procedure the Commission followed in its investigation of the Wexpro transfer and its audit of the transferred properties.[17]

Petitioners' second argument on their denial of due process concerns the Commission's reliance on evidence from the GRC in the Wexpro rehearing. In *Utah State Board of Regents v. Public Service Commission*,[18] the Commission had relied on evidence from a hearing over a year old involving different parties than those present in the case it was hearing, and this Court held therein that admission of this evidence was reversible error. Such is not the case here. At the request of Petitioner Committee of Consumer Services, testimony was taken for nine days in the GRC concerning the transfer of properties to Wexpro. Petitioner Committee announced that if Wexpro testimony was taken in the GRC, it would not have to be taken again in the Wexpro rehearing. The Commission stated, and made it clear in both the Wexpro hearings and the GRC, that it was taking testimony in the GRC for both cases. Petitioners designated for the record in the Wexpro rehearing and for this petition for certiorari portions of the GRC testimony. All petitioners were present and were parties in the GRC, and, importantly, no petitioner expressed dissent when the Commission announced it would take evidence in the GRC concerning Wexpro. Petitioners had notice that GRC testimony would be used in the Wexpro rehearing, and they had an opportunity to respond in both hearings. Hence, no deprivation of due process occurred.

This Court, in the majority opinion, expresses alarm at the transfer of Mountain Fuel's non-utility property to Wexpro at depreciated rather than fair market value, as the issue of whether this property is utility or not was not properly determined by the Commission. I disagree. The Commission heard evidence on all aspects of the transfer and found that this property was non-utility on that evidence and applicable law. As non-utility property, its transfer was outside the Commission's jurisdiction.

What alarms me, inter alia, is that the Court today has actually determined, I believe, that the transferred property is utility property, notwithstanding its decision to remand this case for an evidentiary hearing at which criteria for classification, in the form of three questions are to be employed. Just a facial reading of the majority opinion with these listed criteria and the undis-

---

17. Its audit concluded that the properties transferred to Wexpro were non-utility according to the utility-non-utility classification employed by Mountain Fuel.

18. *Supra*, note 4.

puted evidence in this case convince me that the Court has determined today, without further hearing, that the subject property is utility. Why then, I ask, even though I think the Court is in error, prolong the judicial process by requiring that further hearing.

I now address what the majority opinion determines to be three basic principles of utility law, and upon which it bases its findings and views. These principles are: first, that public utilities sustain a trust relationship to their ratepayers; second, that risk capital for utility development is provided by investors in the utility and that property is included in the rate base to the extent that it is used and useful; and third, that any amount paid to a company as a profit by a utility which controls that company cannot be included as a charge in the rate base (the "no profits to affiliates" rule). I disagree with these principles or the majority's application of them to this case.

First, I find no statutory authority in this State's Public Utility Code, or any case law in Utah supporting the proposition that the relationship between a public utility and its ratepayers is fiduciary or one of trust. As a regulated monopoly, a public utility may not do business in the same manner as it could were it not regulated. Sec. 54–4–2 [19] imposes on the Public Service Commission the standard of regulating public utilities in a reasonable manner consistent with the public interest. If a public utility conforms its practices to the public interest, neither the Commission nor this Court have cause for misgivings. The term "public interest", however, encompasses more than protection of the class of ratepayers at the expense of all others, contrary to what I believe to be the implication of the majority opinion. It necessitates balancing the interests of the utility's ratepayers, its shareholders and the public itself within the utility's area of service. Until the Legislature amends the statutes to provide for a trust or fiduciary responsibility from the utility to its ratepayers, this Court, I believe, should adhere to those statutory mandates now in force as the Commission below has done.

Second, I have no quarrel with the observation made in the majority opinion that utility shareholders provide risk capital. I address the majority's *use* of that principle *infra* in this dissent. But here, I comment on references in the majority opinion to facilities (undeveloped acreage) which are used and useful to the consumer as includable assets in the rate base for reasons now noted. Traditionally, this undeveloped acreage in this case was included in the rate base. But the majority opinion weaves that fact into an argument that this inclusion was justified under a broad definition of a gas plant in Sec. 54–2–1(17), discussed *ante*, and makes the oil properties utility properties.

The argument eludes me. Rather than concluding, as does the majority opinion, that ". . . traditional principles of utility law were modified . . ." by the Commission in permitting this inclusion, but that Sec. 54–2–1(17) justifies this modification, I find another analysis to be legally sounder. It may be, *arguendo*, that a rate of return should not traditionally have been allowed on this acreage, but the question of placing the undeveloped acreage in the # 105 utility account, and the Commission's allowance thereof, was not addressed, argued or appealed to this Court at the times the acreage was placed in that account, nor in the petition for certiorari in this case. So that question is not before us. And that error, if any particularly in view of all of

**19.** Sec. 54–4–2. Whenever the commission believes that in order to secure a compliance with the provisions of this title or with the orders of the commission, or that it will be otherwise in the interest of the public, an investigation should be made of any act or omission to act, or of anything accomplished or proposed, or of any schedule, classification, rate, price, charge, fare, toll, rental, rule, regulation, service or facility of any public utility, it shall investigate the same upon its own motion, and may fix a time and place for a hearing thereof with notice to the public utility concerning which such investigation shall be made, and upon such hearing shall make such findings and orders as shall be just and reasonable with respect to any such matter.

the evidence in this case, does not, in some self-propelling manner convert unregulated oil into a regulated category under the Commission.

Third, I think the "no profits to affiliates" rule has no application to the facts of this case. The cases cited by the majority opinion,[20] concerning profits paid to affiliated construction companies formed by their parent utilities and rights to purchase gas at cost of service reserved in a contract which was regulated by the Federal Power Commission, describe the basic tenets of this rule. Arising under federal regulatory law and cited mostly in federal cases, it has been invoked where a "dummy" corporation is formed as an affiliate to perform services for the utility (a) where the affiliate has no assets or capital of its own, or (b) where the profits paid to the affiliate were fictitious, fraudulent or collusive. The affiliate susceptible to this rule may be so dependent upon the utility that it has no legitimate business existence of its own. The rule has not been interpreted in the cases cited by the majority opinion to disallow all profits paid to affiliated companies. It is a rule narrow in scope, and Courts have cautioned against its expansion.[21]

*Cities Service Gas*,[22] is easily distinguishable from the instant case. There the pipeline utility spun-off to an affiliate its utility owned and federally regulated property from which it purchased gas at cost of service. The transferred property was not non-utility, unregulated oil producing property as in the case here. When the affiliate transferred the property to a non-affiliated company, reaping a $21 million profit to the parent, the United States Court of Appeals for the Tenth Circuit, although discussing the "no profits to affiliates" rule, affirmed

the Federal Power Commission's ruling to price the purchased gas at cost of service rather than the contract amount on the basis that the cost of service rate had been reserved in the Federal Power Commission's grant of the original certificate to the affiliate, which reservation could not be dissipated by alienation to a non-affiliated third party.[23]

In the *Utah Power & Light* case,[24] Mr. Justice Wolfe concluded for this Court that the utility's wholly owned subsidiary, a "dummy" corporation with no assets or capital of its own, was doing construction work for the parent-utility with the parent's assets, and that in such a relationship there was "no reasonable basis as far as rate making is concerned upon which it could be paid more than actual costs."[25]

Such is not the case here. The evidence in this case discloses that Wexpro is adequately capitalized and, in my judgment, owns substantial assets. Its oil production constitutes a legitimate business objective independent of the utility-parent's, Mountain Fuel's, objectives, and it is not formed for, or involved in, the construction of a capital asset for its parent.

*Florida Gas*[26] is no authority for the majority's position. Indeed, the Fifth Circuit, on remand to the Federal Power Commission, disallowed application of the "no profits to affiliates" rule. In that case, four engineering and construction firms were formed from the sale of 37.5 percent of the utility's stock, and neither the utility nor the four-company group controlled the other. The Federal Power Commission, relying on federal regulations and opinions not applicable to this case, and Section 10 of the

20.  *Florida Gas Transmission Company v. Federal Power Commission*, 362 F.2d 331 (5th Cir. 1966); *Utah Power & Light Co. v. Public Service Commission*, 107 Utah 155, 152 P.2d 542 (1944); *Cities Service Gas Company v. Federal Power Commission*, 424 F.2d 411 (10th Cir. 1969), *cert. denied*, 400 U.S. 801, 91 S.Ct. 9, 27 L.Ed.2d 33 (1970).

21.  *Florida Gas Transmission Company*, 362 F.2d at 336, 337.

22.  *Supra*, note 20.

23.  424 F.2d at 417.

24.  *Supra*, note 20.

25.  107 Utah at 193, 152 P.2d at 559.

26.  *Supra*, note 20.

Clayton Act,[27] disallowed, as part of the utility's cost of service, the profits paid to the four company group. The United States Court of Appeals for the Fifth Circuit reversed the Commission because the profits paid were actual, legitimate costs, with no fraud, collusion or fiction involved in their payment, and remanded the case to the Federal Power Commission to determine whether the profits were reasonable without applying the "no profits to affiliates" rule.

In this case, none of the parties had the opportunity to address this rule below or here. Further, petitioners, after a six-month investigation and audit of Wexpro, raised no claims of fictitious, fraudulent or collusively paid profits, and do not raise such a claim here in their petition or in their briefs.

The majority opinion today heralds an unfortunate principle by applying the "no profits to affiliates" rule to this case, I believe. In so doing, it ignores the criteria outlined in the cases it cites as authority, and, further, erroneously assumes (1) that Wexpro is a utility and holds utility property, and (2) that the relationship between Mountain Fuel's utility accounts and Wexpro is so close that acts conducted between them are tantamount to a single intracompany business.

Petitioners attack the Commission's findings and conclusions that the Amended JEA and Amended P & S were in the public interest. They assert error in the Commission's failure to adopt their principle of "gain follows risk," which, as set forth in *Democratic Central Committee v. Washington Transit Commission,*[28] a case on which petitioners heavily rely allocates gains on capital between shareholders and ratepayers under equitable principles. This Court, I believe, espouses the essential principle of this case without discussing it, which I shall now do. It states:

One [Equitable principle] is the principle that the right to capital gains on utility assets is tied to the risk of capital losses. The other is the principle that he who bears the financial burden of particular utility activity should also reap the benefit resulting therefrom. The justice inherent in these principles is self-evident.

. . . . .

The allocative process, we have said, necessitates a delicate balancing of the interests of investors and consumers in light of the governing equitable principles. The constant effort must be a distribution of the gains as fairness and justice may require. . . . Consumers become entitled to capital gains on operating utility assets when they have discharged the burden of preserving the financial integrity of the stake which investors have in such assets. . . . And in appraising the equities, neither administrative nor judicial tribunals are at liberty to ignore economic reality.[29]

Petitioners argue that by inclusion of part of the costs of the exploration and development program in the rate base, the ratepayers have assumed the risks of the non-utility operations, and hence should reap the benefits of these non-utility revenues in decreased gas rates. Prior to 1972, the Commission allowed Mountain Fuel to charge against its utility rates most of its exploration costs where the drilling was unsuccessful, but, as the evidence discloses, this same exploration program resulted in development of significant gas reserves and sales to Mountain Fuel's consumers at rates far below those it would have to charge if it had no exploration program and purchased its gas from other producers.

Petitioners have convinced this Court to treat that part of this expense as a contribution to capital, i. e., an investment, by the ratepayers in the oil and gas properties of Mountain Fuel and Wexpro. The majority opinion states:

---

**27.** 15 U.S.C. § 20 (1976).

**28.** 158 U.S.App.D.C. 107, 485 F.2d 786 (1973), *cert. denied*, 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974).

**29.** *Id.* at 806, 821.

Although the exploration and development costs, which were reflected in the rates and charges were characterized as a just and reasonable expense of the utility by the Commission, these charges were, in effect, a capital contribution to a speculative venture for the purpose of developing oil and gas sources.

and, quoting from Commissioner Rigtrup's dissent,

However, it appears that the shareholders of Mountain Fuel have come to expect an unregulated return from oil properties, for which the risk capital was largely derived in rates charged its customers as ordered by the Commission . . . . .

Such statements evince a disregard for basic accounting principles, i. e., the distinction between expense and capital expenditures. Mountain Fuel, through money supplied by its investors, not its ratepayers, acquired the property it explores and develops for hydrocarbon production. This property is a capital asset, and Mountain Fuel incurred a capital, investment risk when it acquired it. Money used to explore the property, up to that point where the type of hydrocarbon production from the property is ascertained, was expense money. Part of it was acquired from the ratepayers through monies received by them in payment of their gas bills as was part of the other operating expenses of Mountain Fuel. Money which is spent for expenses is usually deducted, for tax purposes, in the year it is spent, and it is treated entirely differently than money spent to capitalize an asset. Certainly its expenditure constitutes no investment or capital risk. Simply, the ratepayer is not assuming an *investment* risk. The risk the ratepayer assumes because the Commission permits Mountain Fuel the expense is the risk that exploration will prove more costly than purchases from other producers. The ratepayer's reward for assuming such risk is that the savings Mountain Fuel realizes from finding its own gas must pass through to that ratepayer.

The record in this case shows that Mountain Fuel's oil has always been treated as the source of reward for those who take *investment* risk, whose money is used for acquisition of both oil prospects and gas prospects, and whose investment may evanesce if Mountain Fuel cannot remain competitive. The record also shows that cost savings attributable to Mountain Fuel's gas exploration program have been substantial and have passed to ratepayers. I cannot see how prospects for that kind of benefit to Mountain Fuel's customers can be enhanced by removing incentives for investors to supply capital for Mountain Fuel's lease acquisitions and oil-oriented drilling.

*Democratic Central Committee*,[30] which established the principle of "gain follows risk," arose from a unique fact situation and is not applicable to this case. The property disposed of in *Democratic Central Committee* had already been determined to be utility property. Such is not the case here. In that case, the District of Columbia Transit Company acquired all the stock of Capital Transit Company at approximately one-half its value. Only $500,000 of the $13.5 million acquisition cost had been paid by the investors; the balance was paid by the utility operations. In Wexpro, capital acquisition was and is undertaken by the shareholders. Successful wells were capitalized in the appropriate accounts, and the utility rates do not reflect these expenditures. In *Democratic Central Committee*, the shareholders paid themselves an average of 83 percent each year on their investment, sold the company's real property, and finally sold the company's worn-out rolling stock to a new transit company. The Court ordered that the profits from the sale of both the depreciable property (the rolling stock) and the non-depreciable property (the real estate) should be treated as utility income. Mr. Justice McKinnon concurred that the profits of the sale to the extent of the accumulated depreciation should inure to the ratepayers' benefit, but strongly dissented as to the profits from the sale of the non-depreciated real property by writing:

30. *Id.*

. . . Outside the District, there is a paucity of cases and the few that are cited cannot directly support the action taken here. [Citations] The majority observes the dearth of decided cases and seems to take this as a "license" to deal with the question as if writing on a clean slate. It would appear, however, that the lack of cases in point is probably more indicative of the fact that no one previously has ever imagined of or argued for such a novel approach with respect to nondepreciable assets.[31]

The Commission refused to adopt *Democratic Central Committee*, and instead found this language from *Board of Public Utility Commissioners v. New York Telephone Company* [32] applicable by citing it in Finding 37: [33]

> The customers are entitled to demand service and the company must comply. The company is entitled to just compensation and, to have the service, the customers must pay for it. The relation between the company and its customers is not that of partners, agent and principal, or trustee and beneficiary. [Citations] The revenue paid by the customers for service belongs to the company. The amount, if any, remaining after paying taxes and operating expenses including the expense of depreciation is the company's compensation for the use of its property. * * *
>
> Customers pay for service, not for the property used to render it. Their payments are not contributions to depreciation or other operating expenses or to capital of the company. By paying bills for service they do not acquire any interest, legal or equitable, in the property used for their convenience or in the funds of the company. Property paid for out of moneys received for service belongs to the company just as does that purchased out of proceeds of its bonds and stock.[34]

*New York Telephone* has been cited many times in recent years as standing for the proposition that customers of a utility pay for service, not for the utility's property, and I find this case to be foundationally strong, sound, and traditional. That part of its holding allowing valuation of utility assets at current market value, no longer followed today, is not germane either to the finding or the logic of that part of the case relied upon by the Commission. The Commission correctly ruled against petitioners when it refused to adopt or apply the principles of gain follows risk, and I believe the majority opinion errs when it adopts those principles.

I also feel constrained to discuss what I believe is the most serious consequence of the majority opinion: a taking of private property *by this Court* without due process of law. Although it remands this case to the Commission for an evidentiary hearing on whether the transferred properties are utility, the majority opinion on at least five occasions (as discussed *supra* in this opinion) in fact determines, in its guidelines to the Commission, that the properties are utility: Under its definitional chain involving Subsections 54–2–1(17), (18), and (30), the undeveloped properties in the # 105 utility account are deemed utility property. Another sentence in Sec. 54–2–1(30), quoted in footnote 7 of the majority opinion, is interpreted to "clearly indicate" that Wexpro, by its activities, is a public utility. And finally, in its instructions for remand, the majority opinion specifies three criteria, any one of which, if met, confer utility status on Wexpro's property. We have discussed these three criteria, *ante*, which appear in the form of questions, noting not only that answers thereto already were found as fact by the Commission below on rehearing but that they were discussed and determined by the majority opinion on appeal, making the whole remand for their resolution demonstrably needless. In this case, it is this Court, not the Commission, which will be

**31.** *Id.* at 834.

**32.** 271 U.S. 23, 46 S.Ct. 363, 70 L.Ed. 808 (1926).

**33.** *Supra*, note 6 at 3394.

**34.** *Supra*, note 32 at 31, 32.

responsible for the appropriation of Wexpro's assets "to the appropriate utility accounts for rate-making purposes." And this Court appropriates those assets on the basis of arguments neither party had a chance to address before the Commission or in their briefs here.[35]

The majority opinion states that regulation of utility property is not a taking. With that proposition generally I do not argue, but I do believe this Court ought not to conclude that property which is and always has been treated as private property becomes utility property, in order to appropriate its revenues to the public use, and all in the name of mere regulation of utility property. That opinion relies on *Natural Gas Service Co. v. Serve-Yu Cooperative, Inc.,*[36] a 1950 case from Arizona, to support its decision to confiscate Wexpro's oil revenues and apply them to the rate base as not violative of due process. In the twenty-nine years since it was decided, that case has never been cited in another case as supportive of the proposition for which the majority quotes it. Instead, I find the language of Article I, Section 22 of the Constitution of this State, and the Fifth and Fourteenth Amendments to the United States Constitution more compelling. Utah Const., Art. I, Section 22 states: "Private property shall not be taken or damaged for public use without just compensation." It is somewhat broader in scope than the Fifth Amendment to the United States Constitution in that it provides for compensation for *damage* to private property.

It is settled that public utilities may perform services in private capacities, and in doing so are subject to the same rules and rights as a private person.[37] And as corporations, of course, they also have rights to due process.[38] I find evidence to support the Commission's determination that the properties transferred to Wexpro were non-utility. To roll into the rate base revenues from the oil property beyond the amount computed as a regulated rate of return is nothing short of a massive appropriation of the property rights of Mountain Fuel's shareholders. This Court has long recognized, as well as have the federal courts,[39] that when private property is forced into the public's service, a taking has occurred. In *Stockdale v. Rio Grande W. R.R. Co.,*[40] this Court stated:

> And the great weight of judicial authority, which we believe to be supported by the better reason, and which is more in accord with our ideas of equity and natural justice, holds that any substantial interference with private property which destroys or materially lessens its value, or by which the owner's right to its use and enjoyment is in any substantial degree abridged or destroyed, is, in fact and in law, a taking, in the constitutional sense, to the extent of the damages suffered, even though the title and possession of the owner remain undisturbed.

and reiterated the principle the following year in *Oregon Short Line R.R. Co. v. Jones*:[41]

> In earlier times it was held that property could be deemed to be taken, within the meaning of constitutional provisions, only

**35.** This Court has generally held that where the parties have not raised an issue either below or in their briefs on appeal, the Court should not volunteer the issue or dispose of the case on that issue. See *Thomas v. District Court,* 110 Utah 245, 171 P.2d 667 (1946).

**36.** 70 Ariz. 235, 219 P.2d 324 (1950).

**37.** *Floyd & Co. v. Cincinnati Gas & Electric,* 96 Ohio App. 133, 120 N.E.2d 596 (1954); 64 Am. Jur.2d Public Utilities § 1; 73 C.J.S. Public Utilities § 9.

**38.** *Olympic Forest Products, Inc. v. Chaussee Corporation,* 82 Wash.2d 418, 511 P.2d 1002

(1973); *Grosjean v. American Press Co.,* 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936).

**39.** *United States v. Causley,* 328 U.S. 256, 261, 262, 264–267 (1946); *See Republic Natural Gas Co. v. Baker,* 197 F.2d 647 (10th Cir. 1952). "The law does not imply a power in the regulatory bodies or the courts to take the property of one party and give it to another in order to effectuate a just result." *Id.* at 650.

**40.** 28 Utah 201, 211, 77 P. 849, 852 (1904).

**41.** 29 Utah 147, 153, 80 P. 732, 734 (1905).

when the owner was wholly deprived of its possession, use, and occupation. But a more liberal doctrine has long been established and an actual, physical taking of property is not necessary to entitle its owner to compensation. A man's property may be taken, within the meaning of constitutional provision such as ours, although his title and possession remain undisturbed. To deprive him of the ordinary beneficial use and enjoyment of his property is, in law, equivalent to the taking of it, and is as much a taking as though the property itself were actually taken. Authorities to this effect are numerous, and this principle of law has become embodied in many Constitutions (taken or damaged) and in many statutes. It is so with respect to our own. [Citations]

And finally, in 1974, this Court interpreted Article I, Sec. 22 of Utah's Constitution as it applied to "damaging" property in *Utah State Road Commission v. Miya*: [42]

However, where a police power is exercised as an incidental result of the exercise of eminent domain, just compensation is due if the market value of the property has been diminished. *The constitutional guarantee of just compensation for the taking or damaging of private property for public use is in no way affected by the fact that the expropriator is exercising the police power.* [Emphasis added.]

The taking of Wexpro's property cannot be justified by the euphemism of "regulation" under the Legislature's police power.

Investor owned public utilities are subject to the regulatory jurisdiction of the Public Service Commission only in regard to their utility property, their rates and their service in Utah. But regulation does not talismanically convert these utilities into ownership by the public. The law's highest function is to remain keenly sensitive to the preservation of all fundamental rights, which include, of course, private property rights.

Together with the Constitutional issue just discussed, I believe that the crucial primary considerations here, by this Court, which must recurrently acknowledge its own limitation of power in appellate review of administrative action, should be whether (1) the findings as a whole are supported by substantial, credible, and competent evidence, (2) the findings, conclusions and final Order are not contrary to law, and (3) the Commission acted without arbitrariness and caprice. It is my view this Court should have resolved these matters here in support of upholding the Commission's determination and concluded that these determinations were consonant with the public interest.

I would affirm the Order of the Commission.

---

42. Utah, 526 P.2d 926, 928 (1974).