Floyd & Company, Inc., Appellant, *v.* The Cincinnati Gas & Electric Co., Appellee.

(No. 7816—Decided February 8, 1954.)

*Messrs. Gorman, Silversteen & Davis, Messrs. Cors, Scherer, Hair & Hartsock* and *Messrs. Ragland, Dixon & Murphy,* for appellant.
*Messrs. Peck, Shaffer & Williams,* for appellee.

Matthews, P. J.   The Court of Common Pleas sustained the defendant's demurrer to the plaintiff's amended petition and, the plaintiff not desiring to plead further, judgment was rendered for the defendant.   It is from that judgment that this appeal is taken.

While the defendant states four grounds for demurrer to the amended petition, two of which are that the plaintiff does not have legal capacity to sue, and that the amended petition does not state a cause of action, we find it unnecessary to consider whether the plaintiff under any conceivable circumstances might have capacity to sue or whether the amended petition considered abstractly states a cause of action.   As we view it, the one question is whether the amended petition states a cause of action in favor of the plaintiff.   We shall examine it to determine that question.

The plaintiff, Floyd & Company, Inc., during the period alleged in the petition, was located in Cincinnati, Ohio, where it was engaged in the business of selling, installing, and servicing gas and electric appliances and space heating equipment.

The defendant, The Cincinnati Gas & Electric Company, during that period, had its principal place of business in Cincinnati, Ohio, and was engaged as a public utility in supplying to customers electricity, for light, heat and power, and natural and other gas for power and heating purposes, including space heating. As such public utility, the defendant was subject to the statutes regulating public utilities, and also the lawful orders of the Public Utilities Commission of Ohio, and was bound, both by the common law (43 American Jurisprudence, 599 *et seq.*), and under Ohio statutes (Sections 4905.22 and 4905.35, Revised Code) to furnish a reasonably adequate supply of gas, without unreasonable preference or advantage to any one, qualified, however, by its duty to conform to the statutes and directives issued in conformance therewith. It was not required to act with the same effectiveness and impartiality in its other relations.

This action is based on the plaintiff's allegation that defendant violated Section 614-68, General Code (Section 4905.61, Revised Code), in wilfully refusing and failing to observe certain orders of the Public Utilities Commission of Ohio, to its injury.

The plaintiff alleged that commencing in 1947 and extending to and including 1950, the Public Utilities Commission of Ohio issued seven "emergency gas orders" applicable to the defendant and other public utilities furnishing gas to consumers in Ohio. All these orders recited that after hearings, of which due notice had been given the Public Utilities Commission found that the unprecented demand for gas and the inability of the utilities to satisfy the demand had creat-

ed an emergency affecting the health, safety and welfare of the people of the state, and that to meet the emergency it was essential that restrictions, operating uniformly throughout the state of Ohio and applicable to all gas distributing utilities dependent in whole or in part upon supplies of gas from others, should be imposed. It was, therefore, ordered that all orders, rules, and regulations theretofore issued by it should be modified in the following respects:

(1) No distributing utility should supply natural gas service to any consumer for equipment designed to furnish the source of space heating that replaces other fuel or for additional space heating equipment.

(2) Limited the class of new buildings and additions to existing buildings to heat which gas could be furnished.

(3) Authorized replacement of old gas appliances by new, provided the capacity was not increased.

(4) Required the public utility to direct in writing ineligible users of gas to discontinue, and, upon failure to comply within 10 days, required the utility to discontinue furnishing any gas to such person until such user complied and the ineligible equipment was removed. As the plaintiff seems to found its claim upon violations of this order, we quote it verbatim:

"Whenever evidence available to the utility reasonably indicates that any consumer has connected gas fired space heating equipment which is not under these rules eligible for service from the utility's gas service lines, the utility shall forthwith in writing direct such consumer to disconnect such equipment and discontinue the use of such service, and if such consumer shall fail or refuse to do so within ten (10) days, the utility shall discontinue the entire supply of natural gas to such consumer and shall withhold such supply until such gas fired space heating equipment has been disconnected. To insure against reconnection of such

space heating equipment the utility, before re-establishing service to such consumer, shall take such measures as may be deemed practicable and necessary to restrict the flow of gas to quantities required for other than space heating purposes."

(5) Required utilities to curtail natural gas service to industrial consumers to the extent necessary to insure continuous flow of gas to domestic consumers.

(6) Required that no action taken by any utility in compliance with the foregoing rules should be deemed to constitute unjust discrimination or a violation of any other order, rule, schedule, or regulation of the Public Utilities Commission, or of said utility.

By an order of April 1, 1948, the Public Utilities Commission provided, among other things:

"No distributing utility shall be required to furnish or supply natural gas to any new or prospective consumer for space heating until such consumer shall have first made written application to and have obtained from such utility written consent and authorization for such use."

By an order of September 6, 1949, the Public Utilities Commission directed that:

"No natural gas company shall be required to supply gas for space heating equipment installed from and after the effective date of this order unless the consumer, present or prospective, or his agent, notifies the company of his intention to utilize such equipment and receives approval therefor."

All these orders were attached to and made a part of the amended petition. They contained many rules and regulations, but we believe the foregoing recitals are sufficient to determine whether the amended petition states a cause of action against the defendant in favor of the plaintiff.

The plaintiff alleged that immediately upon the issuance of such orders and from time to time thereafter,

the defendant notified it that gas would be refused to any prospective consumer for space heating unless and until a written permit was first obtained by the consumer prior to the installation of space heating equipment, and if any installations were made without a permit being first obtained, that the defendant would cease to supply gas to such consumer.

The plaintiff alleged also that it had at all times complied with the order and refused to install gas equipment except when its customer had complied, but that the defendant "wilfully failed, refused and neglected to comply with and enforce the mandatory orders of the Public Utilities Commission, in that it, with full knowledge, allowed and permitted the installation of 9,000 space heating equipments or appliances in 1948, 15,000 in 1949, and 8,000 in 1950, without written permits first obtained, and has wilfully refused and neglected to direct such consumers to discontinue such heating appliances, and has failed and refused to discontinue furnishing gas to them."

The plaintiff charged that the defendant by acting as aforesaid has discriminated against it and thereby caused it to lose customers and business, in that had the defendant complied with the orders and discontinued the supply of gas to such customers, the gas furnished them would have been available for lawful and authorized uses and that it "would have installed 693 additional space heating equipment units" at a profit of $58,828.77 in 1948, 690 in 1949 at a profit of $84.89 on each installation, and would have installed or been able to install 1,395 additional heating units at a like profit, and that during 1950 it would have been able to install 328 additional heating units at a like profit, but was prevented by the aforesaid conduct of the defendant. The plaintiff alleged that its total loss of profits was $205,773.36, and it prayed judgment for treble that amount under the provisions of Section

614-68, General Code (Section 4905.61, Revised Code). By that section, it is provided:

"If any public utility or railroad does, or causes to be done, any act, matter, or thing prohibited by this act, or declared to be unlawful, or shall omit to do any act, matter or thing required by this act, or by order of the commission, such public utility or railroad shall be liable to the person, firm or corporation injured thereby in treble the amount of damages sustained in consequence of such violation, failure or omission; provided, that any recovery under this section shall in no manner affect a recovery by the state for any penalty provided for in this act."

It will be observed that the plaintiff has not alleged that any of its customers had applied to the defendant for gas and been refused. There is no allegation that any applicant for gas was denied a supply for any reason. Nor is it alleged unequivocally that the plaintiff would have installed any heating units but for the action of the defendant. The allegation is that the plaintiff "would have installed or been able to install." It would seem that a fair construction of these allegations is that plaintiff had the capacity or facilities to install more heating units than it had orders for, and that it attributed its lack of orders to the fact that competitors were able to secure the orders or contracts because defendant was willing to furnish gas to their heating units without requiring prior written application therefor. It is not alleged that the plaintiff had binding contracts which defendant's conduct prevented from being performed.

There is no allegation that the defendant exhausted its supply of gas by reason of furnishing gas to those consumers who did not apply in writing in advance and obtain a permit. It is true that the plaintiff's amended petition contains the allegation that it would

have been able to install heating units had the defendant not furnished gas to unauthorized consumers, but we do not construe that to mean that its supply of gas was exhausted. Furthermore, before any person coming within the class of the public to whom the defendant owed the duty to supply gas could complain of a failure on defendant's part to supply gas, it was incumbent on him to apply in writing to it for a permit before installing or enlarging gas consuming appliances, and whether a permit should issue was dependent on the defendant's decision, made in good faith, as to whether the supply of gas would justify the increased use. Unless and until a prospective customer so qualified and the defendant had so found, or acted in bad faith in not so finding, the applicant would be in no position to assert a cause of action against the defendant. And, for stronger reasons, a disappointed dealer in heating units, deprived of an anticipated sale, thereby, would have no cause of action. The defendant as a *public utility* owed no duty to the plaintiff as a *dealer* in heating appliances. The defendant was under no obligation to promote the plaintiff's business. In relation to the public other than in the furnishing of gas and electricity the defendant acted in its private capacity governed by the same rules that were applicable to private corporations, subject only to the limitation that it could not in any way deprive itself of its ability to perform its public duty by any action it might take in its private capacity.

In 43 American Jurisprudence, 571 *et seq.*, on the subject of this dual capacity of public utilities, it is said:

"The term [public utility service] precludes the idea of service which is private in its nature and is not to be obtained by the public, although a public utility may perform acts in its private, as distinguished from

its public, capacity, in which case *it is subject to the same rules as any other private person so acting.*" (Emphasis ours.)

It is stated in 73 Corpus Juris Secundum, 1003:

"The fact that a business or enterpise is, generally speaking, a public utility does not make every service performed or rendered by it a public service, with the consequent duties and burdens, but it may act in a private capacity as distinguished from its public capacity, and in so doing is subject to the same rules as a private person."

We are convinced, therefore, that this case cannot be classified as a case in which a public utility failed to perform its public duty, resulting in damages to one to whom such public duty was owing.

Counsel assert that various cases under similar circumstances have sanctioned recoveries against public utilities. An examination of those cases discloses that all of them fall within the category of cases construing statutes regulating different types of business and creating commissions with power to implement the law by promulgating rules and regulations, and making violations criminal and creating a civil liability in favor of persons injured by violations. They are cases involving The Sherman Anti-Trust Act, the Clayton Act, and the Securities and Exchange and Price Stabilization Acts. The questions in those cases were whether the acts charged were violations of the statutes and whether the plaintiffs had been injured as a direct result of such unlawful acts so as to create a liability in accordance with the general rules of the law of torts.

None of the cases cited involved a public utility bound to furnish a service or commodity against which the charge was made of a failure to perform causing damage to a nonuser of the service or commodity. It seems to us that the most that can be said

is that those cases are of some value as examples of statutory interpretation. They are not in the same category as the case at bar. They are not actions against a public utility supplying services and commodities in that relation.

However, *Kardon* v. *National Gypsum Co.*, 69 F. Supp., 512, does set forth a clear statement (plaintiff's counsel characterizes it as "probably the best statement") of the test for determining liability resulting from the violation of a statute. It is a case in which two stockholders alleged that they had been induced by deceit and fraud to dispose of their stock in two corporations subject to the Security and Exchange Act. A conspiracy to defraud was alleged against the defendants. The fraud consisted in representing that no negotiations for the sale of the assets of the corporation were pending, whereas, such negotiations were pending, and in pursuance of which the assets were sold later to the defendant, National Gypsum Company. None of the defendants had been served within the district. The action came before the court upon defendants' motions to dismiss, because none of defendants had been served within the district, and, also, on the ground that no cause of action was stated. The action was based on the breach of Section 10 of the Security and Exchange Act, in which event the question presented was whether that act either expressly or impliedly authorized a civil action; or whether the action was based on the general principle of the law of torts relating to conspiracies to defraud. The court found that the purpose of the act could be fulfilled only by implying that a civil action was contemplated and that, therefore, the statute authorized it. The court also stated that on general principles the violation of statutes under the circumstances created a civil liability, even though the statutes could not be said to either expressly or impliedly provide there-

for. At page 513, the court quoted with approval the following from 2 Restatement of the Law of Torts, 752, Section 286:

" 'The violation of a legislative enactment by doing a prohibited act, or by failing to do a required act, makes the actor liable for an invasion of an interest of another if; (a) the intent of the enactment is exclusively or in part to protect an interest of the other as an individual; and (b) the interest invaded is one which the enactment is intended to protect.' "

And, at page 514, the court said:

"Were the whole question one of statutory interpretation it might be convincing, but the question is only partly such. It is whether an intention can be implied to deny a remedy and to wipe out a liability which, normally, by virtue of basic principles of tort law accompanies the doing of the prohibited act. Where, as here, the whole statute discloses a broad purpose to regulate securities transactions of all kinds and, as a part of such regulation, the specific section in question provides for the elimination of all manipulative or deceptive methods in such transactions, the construction contended for by the defendants may not be adopted. In other words, in view of the general purpose of the Act, the mere omission of an express provision for civil liability is not sufficient to negative what the general law implies."

Tested by the rule quoted from the Restatement of the Law of Torts, does this amended petition state a cause of action?

Was it the intent of the Legislature in enacting Section 614-68, General Code, to protect the plaintiff as an individual, regardless of whether he was a consumer of gas? It seems to us that this question must be answered in the negative. We think the sole purpose of the statute was to regulate public utilities in discharging the obligation they had assumed to consumers of

gas. Unlike the Securities and Exchange Act and other acts of Congress involved in the cases relied on by the plaintiff, Section 614-68, General Code, does not provide a remedy for the violation of duties theretofore imperfect and made perfect and enforceable by statute. The duties assumed by the defendant attached only in favor of those who used or sought to use its service or commodity. Its assumption of duty was not to the plaintiff as an individual, but only as a customer, desiring its service as a utility furnishing gas.

Was the interest which is alleged to have been invaded, one which the enactment was intended to protect? The plaintiff alleged that its prospective business with third persons was interfered with and curtailed by the failure of the defendant to perform the duty it owed to supply gas to such prospective customers. Was the plaintiff's hope of profit from its business as a dealer in gas appliances an interest within the contemplation of the Legislature when it enacted Section 614-68, General Code, or the rules promulgated by the Public Utilities Commission? It seems to us that the only interest contemplated was that which might result from the consumption of gas. Gas was the subject matter. That was what the defendant had bound itself to endeavor with reasonable diligence to supply. The rules or orders were promulgated to regulate and conserve gas so as to enhance the ability of the defendant to supply it in such a way as to promote the public welfare to the greatest possible extent.

A public utility, by dedicating its property to a specific public use, consents to all regulations having a reasonable tendency to promote the object of the dedication. It does not consent by so doing to the imposition thereafter of rules and liabilities having no relation to the purpose of the dedication. That a public

utility may own property that is neither used nor useful in the performance of its public duty is recognized in Section 499-9, General Code. As to such property and its relation thereto, the utility is entitled to that due process and equal protection of the law that governs all persons having no special relation to government.

We fail to see in what way the imposing of liability upon the defendant in favor of a gas appliance dealer would insure, improve, or facilitate the performance of its duty to furnish gas. To construe Section 614-68, General Code, as imposing a liability for damages to the appliance business would be to declare that it was the appliance business that the Legislature intended to regulate and protect. We doubt the constitutionality of the section if given such a meaning. For the same reason, we are of the opinion that the Legislature did not intend to confer on the Public Utilities Commission the power to promulgate rules that would have the effect of imposing liability under such circumstances.

On this subject, it is said in 73 Corpus Juris Secundum, 1005-6:

"The power to regulate is not the power to destroy useful and harmless enterprise, but is the power to protect, foster, promote, preserve, and control with due regard for the interests of the utility, its patrons, and the public. Accordingly, a utility may be controlled in the use of its property only as far as may be necessary to secure the proper discharge of the duties which it owes to individuals or to the public. * * * The exercise of its power by the state is further limited, of course, by the state and federal Constitutions, in contravention of which no regulation may be made; and the Legislature may not, under the pretense of regulation, deprive a utility of any of its essential rights and privileges, but all regulations must be in

fact within the police power. Any regulation, therefore, which operates as a confiscation of private property or constitutes an arbitrary or unreasonable infringement of personal or property rights is void, because it is repugnant to the constitutional guaranties of due process and equal protection of the laws.''

It is said in 73 Corpus Juris Secundum, 1006:

''Generally speaking, every point of contact between the public and a utility which relates to the performance by the latter of its public duties is subject to regulation by the state.''

The converse of that is equally clear, that the fact a particular public service is assumed is no waiver of constitutional protection against unreasonable and discriminating action in matters unrelated to the performance of the public duty.

It seems to us that 2 Restatement of the Law of Torts, 752, Section 286, states a rule of general application that has been applied and partially expressed in many decisions. In *Trustees of De Pauw Memorial Methodist Episcopal Church* v. *New Albany Water Works*, 193 Ind., 368, 140 N. E., 540, 27 A. L. R., 1274, it was said that for a plaintiff to recover against a defendant for violation of a statute imposing liability in favor of a person ''injured'' by its violation, it was essential to prove that the violation was ''an actionable wrong'' against the plaintiff and that unless there was a prior duty owing to the plaintiff no legal wrong was inflicted upon him by the violation of the statute. In other cases recovery was denied because the damage to the plaintiff was held to be too remote. But, however expressed, the plaintiff failed because it was found that there was no express or implied legislative intent to impose liability under the general principles governing liability in tort.

We, therefore, conclude that, as the intent of the enactment (Section 614-68, General Code) was neither

to protect the plaintiff as an individual nor the business in which it was engaged, there can be no liability in tort based on its violation.

Defendant's counsel expressly disclaims any assertion of contractual liability and have very properly limited the inquiry to a determination of whether there is any basis for a liability in the law of torts. The inquiry has extended over a wide range in the elaborate briefs that have been filed. In reaching our conclusion, we have considered these briefs and the many authorities cited and commented upon in them. To analyze those authorities would extend this opinion unduly and no good purpose would be served by so doing.

In conclusion, we mention that we have considered the possibility of liability in tort based on interference of contract relation between the plaintiff and its customers, to which the rule stated in 4 Restatement of the Law of Torts, 49, Section 766, could apply. See, also, 30 American Jurisprudence, 70 *et seq.* The inapplicability of this principle results from the fact that there is no allegation of any contract between the plaintiff and a customer that was interfered with by the defendant, or that any customer was prevented from entering into a contract with the plaintiff.

For these reasons, the judgment is affirmed.

*Judgment affirmed.*

Ross and HILDEBRANT, JJ., concur.