IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

CHAO XIE SZETO, et al., *Plaintiffs/Appellants,*

*v.*

ARIZONA PUBLIC SERVICE COMPANY, *Defendant/Appellee.*

No. 1 CA-CV 20-0609
FILED 11-30-2021

Appeal from the Superior Court in Maricopa County
No. CV2017-011033
CV2017-056792
CV2018-004433
The Honorable Christopher A. Coury, Judge

**REVERSED AND REMANDED**

COUNSEL

Merlin Law Group, P.A., Phoenix
By Michael Ponzo
*Counsel for Plaintiffs/Appellants*

Gaona Law Firm, Phoenix
By David F. Gaona
*Counsel for Defendant/Appellee*

---

**OPINION**

Judge Paul J. McMurdie delivered the Court's opinion, in which Presiding Judge Peter B. Swann and Judge David D. Weinzweig joined.

---

**M c M U R D I E**, Judge:

**¶1**         Plaintiffs Chao Xie Szeto, Yit Kiu Szeto, and Lydia Briones appeal from the superior court's summary judgment for Defendant Arizona Public Service Company ("APS"). We hold the superior court erred by ruling that APS's tariff bars a claim for property damage caused by a fire allegedly resulting from negligent maintenance of the utility's power lines. We, therefore, reverse the judgment and remand for further proceedings consistent with this opinion.

**FACTS AND PROCEDURAL BACKGROUND**

**¶2**         In August 2020, a fire destroyed two homes, one owned by the Szetos and occupied by Briones. Briones testified that she saw loose power lines dancing and sparking on the utility pole between her home and the house next door just before the fire. Briones and her son fled to the street in front of their home, where she heard an explosion from the backyard. Besides destroying the home, the fire also damaged Briones' personal property. A fire investigator found that arcing in the overhead electrical wires on the utility pole between the two homes caused the fire.

**¶3**         The Szetos and Briones sued APS, alleging that APS negligently maintained the power lines, causing the fire. APS moved for summary judgment, asserting that its public utility tariff exempted it from liability for ordinary negligence. The relevant section of the tariff provides:

> **5.3    Service Interruptions: Limitations on Liability of Company**
>
> > **5.3.1   Company shall not be liable to the customer for any damages occasioned by Load Serving**

> **ESP's[1] equipment or failure to perform, fluctuations, interruptions or curtailment of electric service, except where due to Company's willful misconduct or gross negligence. Company may, without incurring any liability therefore, suspend the customer's electric service for periods reasonably required to permit Company to accomplish repairs to or changes in any of Company's facilities. The customer needs to protect their own sensitive equipment from harm caused by variations or interruptions in power supply.**

¶4 Focusing on the exculpatory clause's reference to a "failure to perform," the superior court found that APS could be liable in connection with providing electric service only if it committed willful misconduct or gross negligence. As a result, the court entered summary judgment against the Szetos and Briones, who had alleged mere negligence on the part of APS. The Szetos and Briones appealed, and we have jurisdiction under A.R.S. § 12-2101(A)(1).

## DISCUSSION

¶5 On appeal from a summary judgment, we view the facts in the light most favorable to the party against whom judgment was granted, *Riley, Hoggatt & Suagee, P.C. v. English*, 177 Ariz. 10, 12 (1993), and "determine *de novo* whether there are any genuine issues of material fact and whether the trial court erred in its application of the law," *Sign Here Petitions LLC v. Chavez*, 243 Ariz. 99, 104, ¶ 13 (App. 2017) (quoting *L. Harvey Concrete, Inc. v. Agro Constr. & Supply Co.*, 189 Ariz. 178, 180 (App. 1997)).

### A. A Tariff Approved by the Corporation Commission is Binding on a Public Service Corporation's Customers and May Limit Certain Liabilities.

¶6 Article 15, Section 3 of the Arizona Constitution authorizes the Corporation Commission to "prescribe just and reasonable . . . rates

---

[1] APS acknowledged during argument in the superior court, "Load-Serving ESP" does not refer to APS. ESPs are companies that supply electricity in competition with APS under Ariz. Admin. Code R14-2-1601 to -1618. *See* ¶ 11 *infra*.

and charges to be made and collected[] by public service corporations within the state for services rendered therein." Under this authority, the Commission requires electric public service corporations to file proposed tariffs that "list the services and products offered by the utility and which set forth the terms and conditions and a schedule of the rates and charges, for those services and products." Ariz. Admin. Code ("A.A.C.") §§ R14-2-201.4.42, R14-2-212(F); A.R.S. § 40-365. Once approved by the Commission, a tariff governs the relationship between the public service corporation and its customers. *US Airways, Inc. v. Qwest Corp.*, 238 Ariz. 413, 416, ¶ 11 (App. 2015), *aff'd and ordered depublished in part*, 241 Ariz. 182 (2016). The tariff becomes a binding contract between the utility and its customers. *Sommer v. Mountain States Tel. & Tel. Co.*, 21 Ariz. App. 385, 387-88 (1974).

¶7        Our constitution does not expressly authorize the Commission to limit the liability of public service corporations. But the rate-setting process requires the Commission to consider a utility's liabilities, so the Commission necessarily has the authority to limit certain liabilities. *See Qwest Corp. v. Kelly*, 204 Ariz. 25, 30, ¶ 13 (App. 2002) ("[T]he [C]ommission's power goes beyond strictly setting rates and extends to enactment of the rules and regulations that are reasonably necessary steps in ratemaking.") (quoting *State ex rel. Corbin v. Ariz. Corp. Comm'n*, 174 Ariz. 216, 218 (App. 1992)). Thus, the Commission may limit a utility's liability for economic damages resulting from service interruptions, which are appropriately considered in ratemaking decisions because of their contractual nature and potential magnitude, but may not limit liability for personal injury and property damages, which are not. *See Pub. Serv. Comm'n v. Mo. Gas Energy*, 388 S.W.3d 221, 231–32 (Mo. App. 2012) (Missouri Public Service Commission acted beyond its authority by limiting a public utility's liability for personal injury and property damages because "limitations of liability involving economic damages are the types of limitations that would be involved in establishing a utility company's rates[, but the] same cannot be said of limitations of liabilities in a negligence action involving personal injury or property damage.").

**B. The Tariff Does Not Preclude APS's Liability for Property Damage Resulting from a Breach of its Duty to Exercise the Highest Degree of Skill and Care for the Protection of Life and Property in the Generation and Distribution of Electricity from its Plant to its Patrons.**

¶8        In determining APS's liability, the superior court relied on the first clause of § 5.3.1, focusing specifically on the term "failure to perform." The court read this provision as eliminating liability for APS's failure to

perform its obligations to transmit and distribute electricity safely. But as noted below, "failure to perform" refers only to a failure to perform by third-party companies called "Load Serving ESPs," not to any failure to perform by APS.

¶9          Tariff interpretation generally presents a question of law which we review *de novo*. *Harby v. Saadeh*, 816 F.2d 436, 439 (9th Cir. 1987) (Tariff interpretation presents a question of law.). We use contract principles to construe tariffs and look first to the tariff's plain meaning to determine its intended effect. 73B C.J.S. Public Utilities § 7 (2021). In addition, "[w]ords are to be given the meaning that proper grammar and usage would assign them." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, at 140 (2012). Grammar is not "a category of indication separate from textual meaning." *Id.* at 141. It is one of the ways the sense of a statute is conveyed. *Id.; see also* Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev. 2118, 2144 (2016) (book review) ("First, courts could determine the best reading of the text of the statute by interpreting the words of the statute, taking account of the context of the whole statute, and applying any other appropriate semantic canons of construction.").

¶10         The first sentence of § 5.3.1 states:

> **Company shall not be liable to the customer for any damages occasioned by Load Serving ESP's equipment or failure to perform, fluctuations, interruptions or curtailment of electric service, except where due to Company's willful misconduct or gross negligence.**

Usually, one applies a prepositive modifier to each element of a list possessing a straightforward parallel construction. Scalia, *supra*, at 147–51. For example, in the phrase "charitable institutions or societies," "charitable" applies to both "institutions" and "societies." *Id.* at 147. We refer to this canon of construction as the series-qualifier canon. *Id.*

¶11         And though the series at issue is less straightforward than the example, we apply the canon to each sublist in the series. Because there is a conjunction rather than a comma between "equipment" and "failure to perform," the two terms make up a single compound item in the series—a sort of list within the list. *See* Scalia, *supra,* at 161 ("Punctuation is a permissible indicator of meaning."). In the context of the whole series, the punctuation means that "Load Serving ESP's" modifies both "equipment" and "failure to perform," so that the liability limitation applies to a "Load

Serving ESP's equipment" and a "Load Serving ESP's failure to perform." And, as APS concedes, there is no question that "Load Serving ESP" does not refer to APS. The tariff always calls APS the "Company," and A.A.C. R14-2-1601 defines "ESPs" as "Electric Service Providers," which are companies that supply the electricity in competition with APS under A.A.C. R14-2-1601 to -1618. Giving the provision its fair meaning, we conclude the tariff eliminates APS's liability for damages caused by Load Serving ESP's equipment or failure to perform but does not apply to a failure to perform by APS itself.

¶12        Although the superior court relied only on the term "failure to perform," APS argues that the provision's reference to "fluctuations" also disclaims liability in this case. But this argument fails because arcing along a service line is not a fluctuation in electric service. By disclaiming liability for damages occasioned by a fluctuation in electric service, the tariff eliminates liability for economic damages incurred when a customer receives voltage that is too high or too low to serve its purpose. But it does not eliminate liability for a fire caused by arcing on a service line.

¶13        This interpretation also tracks the title of the subsection in which the provision is found, "Service Interruptions: Limitations on Liability of Company." And though APS argues that the title of the heading is not part of the term itself, "we consider a provision's meaning in the context of the entire contract." *Terrell v. Torres*, 248 Ariz. 47, 50, ¶ 14 (2020). Of course, we recognize that titles do not constitute part of the law when interpreting statutes because A.R.S. § 1-212 provides as much. Still, in the context of a public utility tariff, we will not ignore a subsection's title in determining the meaning of the subsection.

¶14        In addition, the policy supporting the limitation of liability for economic damages caused by service interruptions does not support eliminating liability for damages to property caused directly by unsafe transmission lines. In *US Airways*, we articulated the policy considerations at issue. 238 Ariz. at 417, ¶ 12. Like other jurisdictions, we recognized that defining and limiting a public utility's liability allows it to provide service at reasonable rates. *Id.* at 417, ¶ 12 (App. 2015); *see also In re Ill. Bell Switching Station Litig.*, 641 N.E.2d 440, 446 (1994) (speculating that the plaintiffs might well end up owning the telephone company if unlimited liability for economic damages were allowed to flow from a major utility outage). But while policy favors limiting liability for damages resulting from service interruptions that can have far-reaching effects, no such policy consideration supports eliminating liability when a public utility company's negligence causes property damage or a personal injury.

¶15 Thus, § 5.3 of the tariff does not disclaim APS's liability for property damage caused by a breach of its duty to exercise the highest degree of skill and care to protect life and property in the generation and distribution of electricity from its plant to patrons. *See Phoenix Light & Fuel Co. v. Bennett*, 8 Ariz. 314, 322 (1903) (defining a utility's standard of care). Thus, the superior court erred by reading the tariff as disclaiming APS's liability for fire damage to property caused by mere negligence in maintaining its service lines.

¶16 As noted in the section that follows, our interpretation avoids a constitutional issue that would arise if the tariff were read as eliminating the Szetos' and Briones' right to bring a negligence claim in this case. *See Smith v. Ariz. Bd. of Regents*, 195 Ariz. 214, 219, ¶¶ 9, 24 (App. 1999) (construing a statute strictly "to avoid any overbroad statutory interpretation that would give unintended immunity and take away a right of action" and declining to address a constitutional argument because the statute as strictly interpreted did not apply); *see also Hayes v. Cont'l Ins. Co.*, 178 Ariz. 264, 273 (1994) (We favor a construction that allows us "to avoid unnecessary resolution of constitutional issues.").

## C. The Question of Liability Here Cannot Be Determined Through a Direct Application of *US Airways*. If Interpreted as Disclaiming APS's Liability for Property Damage Caused by its Ordinary Negligence, the Tariff Would Implicate the Anti-Abrogation Clause.

¶17 The Szetos and Briones argue on appeal that the superior court's interpretation of the tariff violates the anti-abrogation clause of the Arizona Constitution. Under Article 18, Section 6 of the Arizona Constitution, "[t]he right of action to recover damages for injuries shall never be abrogated, and the amount recovered shall not be subject to any statutory limitation." The provision preserves "the ability to invoke judicial remedies for those wrongs traditionally recognized at common law," *Boswell v. Phoenix Newspapers, Inc.*, 152 Ariz. 9, 17 (1986), and protects claims that evolved from common law antecedents. *Hazine v. Montgomery Elevator Co.*, 176 Ariz. 340, 344 (1993). In addition, protection under the provision "is not limited to those elements and concepts of particular actions which were defined in our pre-statehood case law." *Boswell*, 152 Ariz. at 18.

¶18 A statute that effectively deprives a claimant of the ability to bring an action protected by the anti-abrogation clause violates the constitution. *Barrio v. San Manuel Div. Hosp. for Magma Copper Co.*, 143 Ariz. 101, 106 (1984). And as is relevant here, a statute is unconstitutional if it requires a plaintiff suing for negligence to show that the defendant engaged

in conduct more culpable than ordinary negligence. *See Young ex rel. Young v. DFW Corp.*, 184 Ariz. 187, 190 (App. 1995) (holding statute unconstitutional under the anti-abrogation clause because it eliminated dram shop liability except when a driver is obviously intoxicated, and thereby deprived plaintiffs injured by intoxicated drivers of a reasonable alternative to the general negligence action for dram shop liability).

**¶19** The anti-abrogation clause does not prevent parties to a contract from waiving a cause of action. *Lindsay v. Cave Creek Outfitters, L.L.C.*, 207 Ariz. 487, 494, ¶ 24 (App. 2003) ("The law allows a party to voluntarily enter into a contract releasing another party of liability."). But no law may require such a waiver. The anti-abrogation clause "was intended to take the right to seek justice out of executive and legislative control, preserving the ability to invoke judicial remedies for those wrongs traditionally recognized at common law." *Boswell*, 152 Ariz. at 17; *see also Hayes*, 178 Ariz. at 272 (Under the Arizona Constitution, the right to pursue common law damage remedies is protected explicitly from legislative or executive abrogation.).

**¶20** The anti-abrogation clause applies to utility tariffs because they carry the force of law. *See US Airways*, 238 Ariz. at 416, ¶ 11; *see also US W. Commc'ns, Inc.*, 131 P.U.R.4th 486[2] (Ariz. Corp. Comm'n Mar. 27, 1992) ("Once the tariff is accepted by the [C]ommission, the tariff, including the limitation of liability provision, takes on the force and effect of law and governs every aspect of the utility's rates and practices. Neither the utility nor the customer may depart from that tariff's measure of compensation, or the standard of liability contained therein.").

**¶21** Although we have upheld tariffs limiting purely economic damages incurred when a public service corporation's ordinary negligence causes an interruption in service, we have never considered whether a tariff can disclaim a public service corporation's liability for personal injury or property damage caused by negligence. And while the constitutionality of the tariff was not raised before the superior court, we exercise our discretion and consider the anti-abrogation clause's effect on the tariff provision, given that it shapes our *de novo* review of the tariff itself. *State v. Boteo-Flores*, 230 Ariz. 551, 553, ¶ 7 (App. 2012) ("[W]aiver is a procedural concept that we do not rigidly employ in a mechanical fashion, and we may use our

---

[2] Decision may also be found at *US W. Commc'ns, Inc.*, Decision No. 57794 at 56 (April 2, 1992), https://docket.images.azcc.gov/H000000728.pdf?i=1637175913318.

discretion in determining whether to address issues not raised below.")
(citations omitted).

¶22        In *US Airways*, we upheld a tariff provision that limited
damages caused by a service interruption. 238 Ariz. at 419–20, ¶¶ 22–23. In
that case, a construction company informed Qwest, a telecommunications
company, of its intent to excavate in an area where Qwest had underground
cables. *Id.* at 415, ¶ 2. Qwest hired another company to locate and mark the
cables. *Id.* Because Qwest maintained inaccurate underground cable maps,
the company could not find the cables and marked the area safe for
excavation. *Id.* at 415, ¶ 3. The construction company then severed the cable,
causing the plaintiff, a data center, to experience a four-hour interruption
in the telecommunications services it received from a third party. *Id.* The
data center sued Qwest for negligence for failing to use reasonable care to
locate and mark the underground cable. *Id.* at ¶ 4. Qwest argued its tariff
limited damages to the actual cost of the lost service. *Id.* at ¶ 5. The plaintiff
countered that the tariff's liability limitation did not apply to it because it
was not a Qwest customer and that such a restriction would violate the
anti-abrogation clause of the Arizona Constitution. *Id.* at 416, 418, ¶¶ 8, 17;
*see also* Ariz. Const. art. 18, § 6. We held that the tariff did not violate the
anti-abrogation clause because Arizona's common law had not recognized
the duty of a public utility to exercise reasonable care in providing
uninterrupted service. *Id.* at 418–19, ¶ 19. Thus, the tariff properly limited
liability for damages caused by a breach of the utility's statutorily imposed
duty to provide service. *Id.* at 420, ¶ 22; *see also Cronin v. Sheldon*, 195 Ariz.
531, 539, ¶ 37 (1999) (A tort claim alleging wrongful discharge in violation
of the Arizona Civil Rights Act did not exist at common law when Arizona
became a state, did not evolve from common-law antecedents, and was
therefore not protected by the anti-abrogation clause.).

¶23        Here, the superior court relied on *US Airways* to conclude that
APS was not liable for the alleged damages, but *US Airways* is easily
distinguished. Economic loss caused by a service interruption is
meaningfully different from property damage or personal injury caused by
the negligent maintenance of a service line.

¶24        In Arizona, we have long recognized that "economic losses
are best handled by contract law rather than tort law." *Arrow Leasing Corp.
v. Cummins Ariz. Diesel, Inc.*, 136 Ariz. 444, 449 (App. 1983). Commercial
losses suffered by a plaintiff when the defendant fails to provide a
contracted service are generally recoverable in a breach of contract action
as consequential damages, *McAlister v. Citibank*, 171 Ariz. 207, 211 (App.
1992), but are unrecoverable in a negligence action because of the economic

loss doctrine. *Flagstaff Affordable Hous. Ltd. P'ship v. Design All., Inc.*, 223 Ariz. 320, 323, ¶ 11, 326, ¶ 28 (2010) ("'Economic loss,' as we use the phrase, refers to pecuniary or commercial damage, including any decreased value or repair costs for a product or property that is itself the subject of a contract between the plaintiff and defendant, and consequential damages such as lost profits." And a contracting party is limited to contract remedies for purely economic loss.). Thus, an exculpatory clause that eliminates liability for a failure to provide a contracted service generally waives only a plaintiff's right to seek contract damages and does not offend the traditional notion that "[t]he law disfavors contractual provisions by which one party seeks to immunize himself against the consequences of his own torts." *See Salt River Project Agric. Improvement & Power Dist. v. Westinghouse Elec. Corp.*, 143 Ariz. 368, 383 (1984) (abrogated on other grounds).

¶25        A waiver of tort remedies provided by contract is enforceable only when there has been "an intentional relinquishment of a known right." *Salt River*, 143 Ariz. at 385. Our supreme court has explained that even waivers of tort remedies in commercial contracts between sophisticated parties, which are subject to a more relaxed standard, will only be enforced where "parties have equal bargaining positions so that the choice was freely and fairly made and not forced by the circumstances," and that "the parties must have negotiated the specifications of the product and have knowingly bargained for the waiver." *Id.*; *Morganteen v. Cowboy Adventures, Inc.*, 190 Ariz. 463, 466 (App. 1997) (Courts take the most relaxed view of tort liability waiver when parties are business entities.). Just as express contractual waivers of tort remedies are disfavored, such waivers are disfavored in the context of public utility tariffs. *See, e.g.*, *Uncle Joe's Inc. v. L.M. Berry & Co.*, 156 P.3d 1113, 1119 (Alaska 2007) ("[A]ll the reasons for disfavoring [exculpatory] clauses in contracts also apply to tariffs."); *Forte Hotels, Inc. v. Kan. City Power & Light Co.*, 913 S.W.2d 803, 806 (Mo. App. 1995) (disfavoring contract or tariff provisions that purport to absolve public utilities from liability for negligence).

¶26        Recognizing an exception to the rule that purely economic damages are not recoverable in tort between contracting parties, some jurisdictions subject public utilities to tort liability for failing to provide service. *See, e.g.*, *S. E. Ind. Nat. Gas Co. v. Ingram*, 617 N.E.2d 943, 951 (Ind. App. 1993); *Floyd & Co. v. Cincinnati Gas & Elec. Co.*, 120 N.E.2d 596, 599 (Ohio App. 1954). Such liability is based on "the old tort duty to serve all comers which arose as to common callings before the idea of contract had developed." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* 662-63 (5th ed. 1984); *Ingram*, 617 N.E.2d at 951. But because of the "huge magnitude of liability to which a utility might be exposed from a single

failure to provide service that affects hundreds, thousands, or, in the case of an electrical blackout, millions of people," some states allow public utilities to limit their liability for service interruptions through its tariff using an exculpatory clause. Restatement (Third) of Torts § 42 (2012). While there are many examples of courts upholding tariffs with provisions limiting liability for a utility's failure to provide service,[3] it is more difficult to find examples of tariffs that eliminate liability for a straightforward negligence action in which personal injury or property damage was caused by something other than an interruption in service. *But see Mo. Gas Energy*, 388 S.W.3d at 232, n.8 (Mo. App. 2012) (listing cases).

**¶27** The Szetos and Briones seek to recover property damages caused by APS's negligence, not economic damages caused by a service interruption.[4] Arizona has long recognized a right of action for property damage caused by negligence. *Phoenix Light & Fuel Co.*, 8 Ariz. at 322 (recognizing electric company's common law duty to exercise the highest degree of skill and care to protect life and property in generating and distributing electricity from its plant to its patrons). In fact, in *US Airways*, we cited with approval *Lips v. Scottsdale Healthcare Corp.*, 224 Ariz. 266, 268, ¶ 11 (2010), for the proposition that "[c]ourts have not recognized a general duty to exercise reasonable care for the purely economic well-being of

---

[3]     There is variation among the states, but exculpatory provisions in public utility tariffs generally disclaim or limit liability for failure to furnish service. Richard J. Pierce, Jr., *Regional Transmission Organizations: Federal Limitations Needed for Tort Liability*, 23 Energy L.J. 63, 66, n.12 (2002) (citing, *inter alia*, *L.A. Cellular Tel. Co. v. Superior Court*, 65 Cal. App. 4th 1013 (1998); *Ill. Bell Switching Station Litig.*, 641 N.E.2d 440, 441–45 (1994); *Angelo Pavone Enters. v. S. Cent. Bell Tel. Co.*, 459 So.2d 1223, 1226 (La. App. 1984); *Olson v. Mountain States Tel. & Tel. Co.*, 119 Ariz. 321, 323 (App. 1978); *S. Bell Tel. & Tel. Co. v. Invenchek, Inc.*, 204 S.E.2d 457, 460 (Ga. App. 1974); *Burdick v. Sw. Bell Tel. Co.*, 675 P.2d 922, 925 (Kan. App. 1984); *Comput. Tool & Eng'g. Inc. v. N. States Power Co.*, 453 N.W.2d 569, 573 (Minn. App. 1990); *Bulbman, Inc. v. Nev. Bell*, 825 P.2d. 588, 590 (Nev. 1992); *Coachlight Las Cruces, Ltd. v. Mountain Bell Tel. Co.*, 664 P.2d 994, 1000 (N.M. App. 1983); *Lee v. Consol. Edison Co.*, 413 N.Y.S.2d 826, 823 (1978)).

[4]     APS argues that the status of Szetos' and Briones' damages as economic is a factual issue not before the court, but the fire damaged the Szeto's home and Briones' personal property. And the status of damages to real and personal property as a category of noneconomic damages is a legal issue properly considered in our *de novo* review of the summary judgment.

others, *as distinguished from their physical safety or the physical safety of their property.*" 28 Ariz. at 421, ¶ 30 (emphasis added). If the tariff disclaimed liability for a house fire caused by APS's failure to perform its duty to deliver electricity safely, it would implicate the anti-abrogation clause.

## CONCLUSION

**¶28** We reverse and remand for further proceedings consistent with this opinion.



AMY M. WOOD • Clerk of the Court
FILED:   AA